MARYLAND CASUALTY COMPANY, Appellant, vs. THOMAS FURNACE COMPANY and another, Respondents.

*October 16—November 11, 1924.*

*Master and servant: Safe place to work: Duty of employer: Death of employee caused by gas escaping into boiler: Res ipsa loquitur: How rebutted: Method used to control gas best known to business: Burden of proof.*

1. In an action against a furnace company for the death of an employee of a boiler company, occasioned by gas escaping into a boiler in which he was working, the evidence is *held* insufficient to show that the employer furnished an unsafe place for work within the meaning of sec. 101.06 and sub. (3) and (11), sec. 101.01, Stats., in the absence of proof of a better method of controlling gas than that employed.   p. 103.
2. Where plaintiff offered no evidence on the subject and the industrial commission had not made any order requiring a different method than was used, and there was evidence of the defendant that a valve used to control the flow of gas into the boiler was the best device known, the court could not judicially notice that the intake flue could have been readily constructed to prevent the escape of gas.   p. 105.
3. The burden of proof of negligence in all cases is upon the plaintiff, and is not shifted by the application of the doctrine of *res ipsa loquitur* in his favor.   p. 106.
4. When it appeared from defendant's evidence that the methods of controlling the gas were the best known to the business by the president and the engineer of defendant, that the valve

had been properly shut and packed with sand, and that little or no gas appeared to be in the boiler after the accident, the *prima facie* case of the plaintiff under the doctrine of *res ipsa loquitur* was fully met; and when plaintiff offered no evidence that a better method was in vogue, or that prior casualties had resulted from the actual method used, there was nothing to submit to the jury.   p. 106.

CROWNHART, J., dissents.

APPEAL from a judgment of the circuit court for Milwaukee county: CHESTER A. FOWLER, Judge.  *Affirmed.*

The appeal is from a judgment dismissing plaintiff's complaint.

The plaintiff is the insurance carrier of the defendant *Murphy Boiler Company,* employer of one Mullens, deceased, who came to his death in the plant of the defendant *Thomas Furnace Company.* The widow of the deceased was awarded compensation under the workmen's compensation act, which was paid by the plaintiff, and under its right of subrogation the plaintiff brings this action to recover from the *Thomas Furnace Company* the amount which it was obliged to pay, and the *Murphy Boiler Company,* having refused to commence the action, was made a party defendant for the purpose of foreclosing any rights it might have in the premises.

The defendant *Thomas Furnace Company* at the time of the accident was engaged in operating a blast furnace in the city of Milwaukee for the manufacture of pig iron.   The furnace is located about 125 feet from the boiler in which the accident happened, and in order to utilize the gas from the furnace for power production the same is led in an underground flue to the boiler, and the flue is then subdivided into four separate smaller flues leading up from the main flue under the boiler, and at the top of each of these smaller flues is attached a nozzle from which the gas is sprayed so as to come in connection with a grate where coal is burned, and when the gas comes in contact with the burning coal the same is ignited and produces heat, which in turn

heats the boiler. These smaller flues are each about one foot square and are built into the wall of the boiler, practically flush therewith, and both flues and nozzles are constructed of cast iron. In each of these smaller flues is a butterfly valve, a patented device known as the Morrison patent, such valve being somewhat of the nature of a damper in a stove pipe. It fits the gas flue and turns inside the flue until it hits a bracket on the side of the flue. The butterfly valve is about fourteen to eighteen inches below the top of the smaller gas flue. When the boiler is shut down the butterfly valve is closed, the nozzles are removed, and the space between the valve and the top of the flue is filled with wet sand and ashes, the sand and ashes being placed in the flue in order to obstruct the escape of gas which might leak through the butterfly valve. The boiler in which the accident happened had been used by the furnace company since 1899. Both Mr. Thomas, the president of the furnace company, and the engineer of the company testified that they knew of no better device or means with which to prevent the escape of gas from the flues into the boiler.

Some two weeks prior to the happening of the accident the boiler in question was shut down in order to enable the defendant *Murphy Boiler Company* to take out an old drumhead of the boiler, located about twenty feet above the ground, and to replace it with a new one. In order to perform this work the boiler company sent Mullens, one of its employees, and one Luedtke, also an employee, to the plant of the furnace company, and these two men, together with one Cook, an employee of the furnace company, entered the boiler and proceeded to do the necessary work. Mullens had been an experienced boiler maker since 1886, and had been employed on a number of occasions (according to the testimony of the engineer of the furnace company not less than fifteen times) to renovate, repair, and replace boilers of the furnace company. In the absence of Mr. Murphy, Mullens had charge of the work on the boiler, and as the

work progressed Murphy would supervise it and from time to time give directions in regard to the same. The fact that gas was frequently present in the boiler while such work progressed was well known to Mullens, and he had frequently been cautioned not to work in the boiler continuously, but at frequent intervals to go out into the fresh air in order to overcome the evil effects of the gas. It was also known to him that it was dangerous for one man to work in the boiler alone, and that two or more men at all times ought to be engaged in the work in order that proper assistance might be given to any employee who might be overcome by gas in the course of his work. At the time of the accident the crew had been employed in rebuilding the boiler for a period of about two weeks. During this period gas frequently made itself manifest to the employees so engaged, and during all this time the practice was observed by the employees to leave their work periodically and to spend from ten to fifteen minutes in the open air before resuming the work. From the time the employees began their work in the morning until the noon hour of the day of the accident the employees resorted to the fresh air after every half or three quarters of an hour of work. Mullens had complained of a headache during the morning, and there is also evidence to the effect that Luedtke notified the engineer of the furnace company that the boiler contained an unusual volume of gas. After the usual lunch period at noon Mullens and his two helpers resumed their work, and at the expiration of about three quarters of an hour Mullens again complained of a headache and ordered the men from the boiler. The two helpers made their exit onto a platform or staging in front of the drumhead, and there is no evidence that Mullens was actually seen outside of the boiler alive after that time. When the helpers returned to the boiler they ascertained that Mullens was unconscious and lifeless. An effort was immediately thereafter made by means of a pulmotor to resuscitate Mullens, without avail.

For the appellant there were briefs by *Walter F. Mayer* and *James E. Coleman,* both of Milwaukee, and oral argument by *Mr. Mayer.*

For the respondent *Thomas Furnace Company* there was a brief by *Bottum, Hudnall, Lecher & McNamara* of Milwaukee, and oral argument by *Geo. B. Hudnall.*

For the respondent *Murphy Boiler Company* there was a brief by *Lines, Spooner & Quarles* of Milwaukee, and oral argument by *Charles B. Quarles.*

DOERFLER, J.   It is plaintiff's contention that the furnace company failed to furnish to Mullens a safe place of employment.    Sec. 101.06, Stats. 1923, formerly sec. 2394—48, Stats. 1917, provides:

"Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof, and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. . . ."

Sub. (3), sec. 101.01, Stats. 1923, being sub. (3), sec. 2394—41; Stats. 1917, provides:

"The term 'employer' shall mean and include every person, firm, corporation, agent, manager, representative or other person having control or custody of any employment, place of employment or of any employee."

Sub. (11) of said section provides:

"The term 'safe' or 'safety' as applied to an employment or a place of employment . . . shall mean such freedom from danger to the life, health, safety or welfare of employees or frequenters, . . . as the nature of the employment, place of employment, . . . will reasonably permit."

In *Olson v. Whitney Bros. Co.* 160 Wis. 606, 150 N. W. 959, the statutes above referred to are construed, and it was

there held, present Mr. Chief Justice VINJE writing the opinion:

"Safety is not an absolute, fixed term, but a relative one, being always measured by the kind of employment and the manner in which it is customarily carried on and by the use appliances are, with the knowledge of the employer, being put to, or which an ordinarily prudent person might reasonably anticipate they may be put to. Therefore if a place of employment or an appliance is as free from danger as the nature of the employment will reasonably permit when used in a customary or usual manner for the work intended, or in such a manner as an ordinarily prudent and careful person might reasonably anticipate it might be carried on or used for, it is safe, though it may not be safe for a condition or a manner of carrying on the work that could not reasonably be anticipated by the employer."

The statute pertaining to a safe place of employment imposes upon the employer an absolute duty, and he can only comply with the statutory requirements by performing that duty, and unless he meets his obligations as thus required the amount of care which he has devoted will not relieve him from liability unless other available defenses are established. It appears from the evidence introduced by the plaintiff that during the two-weeks period while Mullens was engaged in his work, some gas was contained in the boiler. The valve in use was a patented device, and at the time of its installation was the best device known to furnace men engaged in a business similar to that of the furnace company. The president of the furnace company, Mr. Thomas, and the engineer of the company, both of whom have had long years of experience in the furnace business, knew of no better device. In addition to the valve, in order to further frustrate the escape of gas the packing of the flue above the valve with wet sand and ashes to a height of about fourteen to eighteen inches was also resorted to. It would appear almost conclusively that the means adopted by the furnace company to prevent the escape of gas were not only in accordance with the usual method adopted by furnace men,

but that it constituted a method which was as safe as the business of the furnace company would reasonably permit. Under the provisions of the workmen's compensation and the industrial commission acts, the commissioners were vested with the supervision of every employment and place of employment in this state, and they were authorized, and in fact it was their duty, to adopt and enforce all proper orders, rules, and regulations for the protection of the life, health, safety, and welfare of every employee in such employment or place of employment. Members of the industrial commission are experts in matters of this kind, and it would appear that unless a member had special knowledge with respect to manufacturing industries he would not be in a position where he could adequately fulfil the requirements of his office. No rule, regulation, or order of the industrial commission requiring a different or better system to prevent the gas from escaping was called to our attention, and the evidence does not show that any effort whatsoever was made to provide a better system. The operation of a furnace like the one in question is one connected with unusual hazard to the life and health of the employees, and we assume that in adopting rules and regulations and in making and enforcing orders the commission would pay prompt and early attention to such a business. In the discharge of their duties the members of the industrial commission represent the public interest, which is designed to preserve life and health. Inquiry made at the office of the industrial commission and an inspection of the records of such commission by a member of this court yielded the information that at the time of the happening of the accident no order, rule, or regulation was in force by the commission which required a different method than that which was in operation at the plant of the defendant furnace company. We must assume that they had knowledge of the method employed, and, not having criticised the method or ordered or devised a different or

better method, that this method had the approval of the commission.

It may be claimed, although such claim was made neither in the brief nor the argument, that it is a matter of common knowledge that a flue like the one in question can readily be so constructed as to be proof against the escape of gas, and that other methods such as ventilating systems may be introduced in order to purify the atmosphere in a boiler or other similar device. This, however, is a subject of which the court cannot take judicial notice. It is within the field of experts. Plaintiff's counsel did not introduce evidence upon this subject, and, as before stated, no such device was deemed necessary by the industrial commission, and the members of such commission are experts.

Work on boilers like that of the defendant furnace company is only performed at comparatively long intervals, when the boiler becomes out of repair or where a new boiler must be installed. The work of the deceased, Mullens, was not confined to the repair or replacement of furnace boilers, but to boilers in general. Adequate precaution had been imparted to the deceased with respect to his conduct in regard to his work in this boiler. He was the sole judge of the time necessary for recuperation in the open atmosphere. No evidence was introduced showing that employees prior to that time had either been overcome by gas or that any one had lost his life. Under these circumstances we can readily agree with the learned circuit judge when he directed a nonsuit upon the substantial ground that the place of employment was as safe as the business of the furnace company would reasonably permit.

When the plaintiff rested its case the learned circuit judge denied a nonsuit upon the ground that plaintiff's case was one coming under the doctrine of *res ipsa loquitur*. It appeared from plaintiff's evidence that the operation of the furnace plant, the conduct of the gas through the flues, the

method of preventing the escape of gas by means of the valve and the wet sand and ash pack, and the duty to turn off the gas from this boiler, were solely the obligations of the defendant furnace company and its employees, and that no one else had authority to act in the premises. However, after the defendants' evidence had been introduced and the methods demonstrated, and when it appeared that these methods were the best known to the business by the president and the engineer, and when it also appeared that the valve had been properly shut and the pack had been placed over the same, and that little or no gas appeared to be in the boiler after the accident, the *prima facie* case of the plaintiff was fully met, and there was nothing left to submit to the jury. The burden of proof to establish the defendant's negligence in all cases is upon the plaintiff, and, where the doctrine of *res ipsa loquitur* applies, does not shift. No evidence was attempted to be introduced on plaintiff's part to show that a better method was in vogue, which, had it been testified to, would have raised a jury issue. No evidence was introduced to show that prior casualties had resulted from the actual method employed. Had such evidence been introduced, it might have devolved upon the defendant furnace company to resort to a scientific investigation in order to establish, if possible, a better method.

It would appear almost as an irresistible conclusion that the death of Mullens was caused by the cumulative effect of the monoxide gas, resulting from his failure to resort to fresh air at more frequent intervals.

The judgment of the lower court is affirmed.

*By the Court.*—Judgment affirmed.


CROWNHART, J. (*dissenting*). The facts in this case have been fairly stated by the court. The safety statute has also been set out in the opinion. The decision turns on the question of common knowledge of which the court will take judicial notice.

In the course of judicial proceedings there has grown up·
the principle, which is firmly established by thousands of
decisions, that those things which are of common knowledge
in the jurisdiction of the court will be judicially noticed and
accepted as facts in the trial of a case, without proof.   In
other words, the courts are presumed to possess the intelli-
gence generally possessed by the people in the same judicial
district.   Juries have the same right to apply their common
knowledge and experience in the consideration of their ver-
dicts.   15 Ruling Case Law, "Judicial Notice;" 23 Corp.
Jur. "Evidence—Judicial Notice."

The question here to be determined was whether it is a
matter of common knowledge that fuel gas can be readily
and safely contained, and whether it is a matter of common
knowledge that such gas could have been displaced by ven-
tilation so as to have made the place of employment safe.
I am of the opinion that both of these questions should be
answered in the affirmative.   I am unwilling to confess ig-
norance where such confession is self-abasement rather than
modesty.

. Fuel gas, which contains the dangerous monoxide gas, is
and has been in common use in this state for very many
years.   It is used for light, heat, and power.   It is safely .
contained in great tanks.   It is piped into houses and used
by housewives without danger.   It is safely used for power
in thousands of· engines throughout the state.   It is known
by every one who comes in contact with gas that it can be
safely controlled in metal containers, and by the proper use
of simple contrivances the flow of gas can be completely
regulated.   This, then, was the situation when Mullens was
sent to his death in a room filled with poisonous gas.   The
gas was lighter than the air, and was introduced at the bot-
tom of the boilers, while Mullens was working at the top,
where the gas would rise and make the place especially dan-
gerous.   It is admitted the gas was introduced through a
flue which was closed by a butterfly valve similar to the

damper in a stove. This butterfly valve allowed the escape of gas, and, to partially control the escape of gas, ashes and sand were placed on top of the valve. But it is admitted that this did not prevent the escape of gas through the butterfly valve and the sand and ashes, so that the place where Mullens worked was, continually, highly dangerous. On the day of the accident the workmen had been obliged to escape from the dangerous situation into the open air each half hour or so. Monoxide gas is cumulative in its effect; that is, a person inhaling a quantity of it at one time during the day would require less gas at a subsequent time to overcome him. It is tasteless and odorless. The workmen could only judge of its effect by reason of headaches that came on. Now, notwithstanding this highly dangerous situation, the defendant furnished this place of employment for workmen, and for work which was to continue over a period of weeks. It was to meet such situations that the safety statute, quoted in the opinion, was passed. That statute is more important to the health and welfare of workers than any other law that has been placed on the statutes of Wisconsin. It should not be whittled away or made ineffective, but on the contrary it should be fairly enforced and given every reasonable intendment to carry out its purpose. It is plain to my mind that this place of employment was not reasonably safe within the meaning of the statute, but, on the contrary, it was highly dangerous, and the danger could have been readily removed, and should have been removed, in the exercise of common prudence. Its danger could have been prevented, as I have said, by simple contrivances,— for one thing, by a metal cap that would screw on or be fastened on tightly to the gas flue. For another thing, the valve could have been packed with substances that were not readily permeable by gas, like ashes and sand. A still more simple way, and one which has been pointed out by the industrial commission as early as 1913, was to introduce into the boiler housing pure air to displace the gas-laden air.

Every manufacturer understands how this may be done, and it is a very simple thing, of which people have common knowledge.

An attempt is made in the opinion to excuse the defendant because the industrial commission had not provided a rule with reference to this particular place of employment. No such rule was required of the industrial commission. The statute furnishes the rule, but in the enforcement of the rule the industrial commission, from time to time, does make orders.   But it should be noted that this was not an ordinary place of employment; it was a temporary condition, of which the commission might have no knowledge.   But as early as 1913 the commission did issue General Order 2013, reading as follows:

"Order 2013. *Furnaces and forges.* All furnaces and forges which emit gas or smoke in such quantity as to be irritating, obnoxious, or injurious to health must be equipped with a ventilating system which will remove as much of the gas and smoke as the character of the work will permit."

And Order 2014:

"Order 2014. *Foundries, forge shops, and roundhouses— Ventilation.* All foundries, forge shops, roundhouses, and *other places* of employment in which smoke, gas, dust, or vapors are present in sufficient quantities to obstruct the vision, or to be irritating, obnoxious, or injurious to the health, must be equipped with a system of ventilation which will eliminate such smoke, gas, dust, or vapors in so far as the conditions of the industry will permit. . . ."

While these orders do not cover the exact situation here, they do sufficiently suggest a proper method to be used by the employer.   The industrial commission does not run these plants, and the statute does not direct the industrial commission to furnish the safe place.   It is the employer who is required to do this.   He cannot, and ought not, be allowed to shift his responsibility onto the commission. Here is a great public-policy statute, important to employ-

ers, employees, and the public.  It needs no apology and allows of no evasion.  The attempt to show compliance by proof of common practice or claim of ignorance as to better methods should be frowned upon.  That was the old rule that the statute is designed to escape.  This statute aims to protect human health and life.  A reasonable compliance with it would have saved the life of Mullens.

The plaintiff failed to show by evidence that there was any safer practice which could be reasonably adopted.  Prudence on plaintiff's part might have suggested the danger of supposing that the court would take judicial knowledge that gas may be readily and easily contained, or that ventilation would overcome the danger.  But plaintiff's failure to prove matters of common knowledge does not excuse the court from applying the rule of common knowledge, where such matters are in fact of common knowledge, to be judicially noticed.

For these reasons I respectfully dissent.