JOSEPH B. FLEMING et al., Trustees, Appellees and Cross-Appellants, v. B. M. RICHARDSON, individually and as Chairman of IOWA STATE COMMERCE COMMISSION, et al., Appellants.

No. 46821.

September 17, 1946.

James A. Lucas, of Des Moines, for appellants.

J. G. Gamble, R. L. Read, and A. B. Howland, all of Des Moines, for appellees and cross-appellants.

BLISS, J.—On complaint of a trainmen's association that the Chicago, Rock Island and Pacific Railway Company was violating section 7972 of the 1939 Code of Iowa (section 477.27, Code, 1946), by operating caboose cars on its railroads in Iowa with but one platform, a hearing was had before the Iowa State Commerce Commission, which resulted in an order of the commission directing the company to discontinue the use of one-platform cabooses on its Iowa lines. From the admissions in the railway company's answer to the complaint the commission found that since late in the year 1940 the company has used on certain branch lines in Iowa nineteen of such caboose cars equipped with a platform on but one end of the car. The commission also found that such cabooses have indiscriminately been used on freight trains handling both interstate and intrastate traffic, and that they have been and were then being used at times with the platform end of the caboose next to freight cars ahead of it and at other times with the platform end of the caboose at the extreme rear end of the train. There is no controversy about these facts. Since it was beyond the province of the commission to pass upon the constitutionality of said section 7972, it was compelled to find that the railway company had violated this particular provision of the section. Other provisions of it are not involved in this proceeding.

The railway company, through its trustees, and pursuant to section 7887 of the 1939 Code (section 474.28 of the 1946 Code), brought appellate proceedings to the district court of Polk county to vacate the order of the commission. It was successful in that proceeding and the district court, in conformity to its findings of fact and conclusions of law, entered a decree that, insofar as the commission's order prohibited the use of one-platform cabooses by the railway in interstate commerce it was invalid and was therefore vacated, but that insofar as the order prohibited the use of such cabooses in purely intrastate commerce it was valid.

The defendants, as officers of the Iowa State Commerce Commission, have appealed from that part of the decree which is adverse to them, and the plaintiffs, as trustees of the railway company, have cross-appealed from the part of the decree which holds that the use of such cabooses in Iowa intrastate commerce is a violation of said section 7972.

Discussing first the appeal of the officers of the commission, it appears that from the inception of this proceeding it has been the contention of the State Commerce Commission, first, that neither the United States Safety Appliance Acts nor any order thereunder of the Interstate Commerce Commission prescribed or specified a caboose platform as a safety appliance; second, that neither Congress, by those acts, nor the Interstate Commerce Commission, by its orders thereunder, had invaded, to say nothing of having occupied, the field pertaining to the construction of cabooses or caboose platforms or the requirement of any particular type of caboose; and, third, that if the Interstate Commerce Commission's order of March 13, 1911, could reasonably be construed to be a prescription or authorization for types of cabooses to be used, which construction the defendants-appellants deny, the order does not include a one-platform caboose.

The cross-appellants, in their printed brief and argument, say this of their opponents' contentions:

"In an attempt, therefore, to concisely state the issues, as they are made to appear in the Commission's argument, we submit that they are as follows:

"1. Is an outside platform on a caboose car merely a feature of construction *or is it in the nature of a safety appliance or safety equipment?* [Italics supplied.]

"2. Do the standards of safety equipment provided for by the Interstate Commerce Commission in its order (Exhibit 3) authorize the use of a caboose car with one platform? * * *

"We believe that the first issue is the only issue of any materiality * * *."

The italicized words in question 1 do not fairly state that particular contention of the State Commerce Commission nor do they state a very material matter. The contention of the

commission and one of the controlling factors in the determination of this appeal is not whether a platform on a caboose car is "in the nature of a safety appliance or safety equipment," but whether it *is*, *in fact*, a safety appliance which is *specified in the Safety Appliance Acts,* or in the Interstate Commerce Commission's order of March 13, 1911. The latter fact is of the lesser importance because the commission has only such powers as are expressly given to it, or are clearly implied, by Congress. But the fact is that a caboose platform is neither *expressly designated* nor *impliedly included* in the Safety Appliance Acts or in any order of the commission. It is one thing to say that a caboose platform is specified as a safety appliance in the acts or the order and something quite different to say that "it is in the nature of a safety appliance or safety equipment." The doors and windows—in fact, every part of a caboose—are "in the nature of a safety appliance or safety equipment" because each and all of them conduce to the safety of and render a protective service to those in, or using, the caboose; but that does not bring these parts within the scope or intendment of any of these acts, or of the order issued thereunder by the Interstate Commerce Commission. The number and the identification of each safety appliance specified in the acts were of especial concern to Congress, to the Interstate Commerce Commission, and to the railroad companies, because the designation in the acts of each safety appliance meant a large addition to the financial burden of the railroads in complying with the requirements, and was an important consideration in fixing the time in which compliance should be performed. For these reasons nothing was left by Congress to implication. Had it intended that a caboose platform was a safety appliance to be included in any of the Safety Appliance Acts it would have said so. But it did not say so.

The contentions of the Iowa commissioners have not been successfully answered or avoided by the trustees for the railway company or by the opinion of the trial court. Considering first the propositions for affirmance relied upon by the trustees, in the order stated by them:

1. The Federal Safety Appliance Acts were enacted to promote the safety of railroad employees and the traveling public.

No one will dispute this. The purpose is so stated in the title to the first of these acts. The proposition is of little materiality in this case.

2. By the enactment of these acts the Federal Government occupied the field of regulation concerning the standards of safety equipment of all cars, including caboose cars, used by interstate common carriers by railroad. Inasmuch as the Federal Government has supreme and exclusive power and authority in this field, it follows that the several states are without jurisdiction or power to legislate in the same field.

It must be conceded, and no one will contend otherwise, that under the commerce clause of the Constitution of the United States, (Article I, section 8), ''The Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States * * *.'' The decisions of the United States' Supreme Court have held that this power is plenary and unlimited. It will also be conceded that by the Safety Appliance Acts Congress occupied the field of regulation with respect *to the safety appliances designated therein,* as applied to caboose cars, with and without platforms, and to all other cars used by railroad carriers in interstate commerce, and that within the circumscribed compass of the appliances so designated the State of Iowa and all other states are without power to legislate.

3. ''A platform on a caboose is a safety appliance, and is not merely a feature of construction * * *.''

Herein lies a basic error in the opinion of the trial court and in the contentions of the trustees. It is an erroneous premise which destroys their conclusions. Its refutation depends upon facts and analysis of the Safety Appliance Acts and the order of the Interstate Commerce Commission, which will be discussed later.

4. This proposition, which applies to the letter of the Director of the Bureau of Safety of the Interstate Commerce Commission, will also be discussed later.

5. ''The regulations of the Interstate Commerce Com-

mission promulgated March 13, 1911 (Exhibit 3), contain elaborate prescriptions for both caboose cars with platforms and caboose cars without platforms. Implicit in these regulations is the approval of the Interstate Commerce Commission of a caboose car with one platform or with two platforms or with no platform whatsoever, as standard. The Federal Government has occupied the field, and legislation in that field by the state is nullified.''

There is no merit to this proposition, but what is said above of proposition 3 applies to proposition 5.

Proposition 6 is but an abridged duplication of proposition 5.

On April 15, 1911, the Thirty-fourth General Assembly of Iowa, by chapter 93 of its Acts, approved the legislation which appears as section 7972 of the Code of 1939 (section 477.27, Code of 1946). It was additional to the general statutes relating to the construction and operation of railways. There has been no change in the statute as originally enacted. It then provided, ''That from and after the 1st day of Jan. 1912, it shall be unlawful, except as otherwise provided in this act, for any such common carrier by railroad to use on its lines any caboose car or other car used for like purposes, unless such caboose or other car * * * shall be provided with a door in each end thereof and an outside platform across each end of said car,'' with proper guard rails, grab irons, hand brakes, and steps suitably guarded. Prior to and since that time there has been other legislation requiring other safety appliances: notably provisions relative to headlights, foot boards, grab rails, etc., on locomotives, chapter 126, Thirty-third General Assembly, approved April 2, 1909, and automatic fire-box doors, chapter 156, Forty-first General Assembly, approved April 3, 1925.

For several years prior to the passage by Congress of the first Safety Appliance Act, because of the many casualties among trainmen in the coupling of freight cars with the link and pin, there had been much public discussion of the necessity of legislation for appliances which would give these men greater protection. At the national conventions of the Republican and Democratic parties in 1892 there was a plank

in each platform demanding such legislation. President Harrison had recommended it in each of his four annual messages to Congress. In his first message of December 3, 1889, he spoke of petitions asking that steps be taken "to bring about the use of automatic brakes and couplers on freight cars." After reference to the casualties, he continued:

"It is competent, I think, for Congress to require uniformity in the construction of cars used in interstate commerce and the use of improved safety appliances upon such trains. Time will be necessary to make the needed changes, but an earnest and intelligent beginning should be made at once." IX Messages of the Presidents, 51.

While the President suggested that Congress had the power to require uniformity or standardization in the construction of cars of railroads engaged in interstate commerce, he never asked for such legislation. He was content, for the time being, to ask for legislation for automatic brakes and couplers on freight cars. No congressional legislation has ever been enacted for standardized railroad rolling equipment. And there is no fact basis for the contentions of the trustees or of the trial court that the I. C. C. order of March 13, 1911, established any kind of caboose, with or without platforms, or with but one platform, as a standard caboose beyond the regulation of a state.

After much debate in both the House and Senate of Congress, the first of the "Safety Appliance Acts" was approved March 2, 1893. There was much opposition in Congress to the bill by the railroad companies, largely because of the huge financial burden which it would put upon them, many of which were in receivership and but a few of the larger ones were paying dividends. There was evidence before the congressional committees that there were then about ninety thousand freight cars in the country and that the estimated cost of the bill to the railroads would be between seventy-five and a hundred million dollars. There was no thought, of course, in the minds of Congress, the Interstate Commerce Commission, or of anyone, that the bill gave or was intended to give to the commission any authority to issue any orders prescribing any plans or standards

for the construction of freight cars, passenger cars, cabooses, locomotives, or any of the rolling stock of the companies. Such an order could be and likely would be, destructive of the vast equipment then possessed by the railroad companies.

The title to the Act of March 2, 1893 [27 Stat. at L. 531, chapter 196] was:

"An Act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their *cars* with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes." (Italics supplied.)

Section 1 of the act provided that from and after the first day of January 1898, it would be unlawful for such carrier to use any locomotive in interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train not having a sufficient number of cars in it so equipped with power or train brakes that the engineer could control its speed without requiring the brakeman to use the common hand brake.

Section 2 provided that on and after January 1, 1898:

"* * * it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

Section 4 provided that after the above-mentioned date:

"* * * until otherwise ordered by the Interstate Commerce Commission, it shall be unlawful for any railroad Company to use any car in interstate commerce that is not provided with secure grab irons or handholds in the ends and sides of each car for greater security to men in coupling and uncoupling cars."

Section 5 provided that within ninety days from the passage of the act the American Railway Association was authorized to designate to the Interstate Commerce Commission the standard height for drawbars in both loaded and empty freight cars.

On March 2, 1903, an amendment (45 U. S. C., section 8) to the original act was approved making the latter applicable to railroad common carriers in the Territories and the District of Columbia. The original Safety Appliance Act of March 2, 1893, (45 U. S. C., section 1) did not embrace all cars on the lines of interstate carriers but only those *engaged* in interstate commerce. Brinkmeier v. Missouri Pac. R. Co., 224 U. S. 268, 32 S. Ct. 412, 56 L. Ed. 758. But by the amending act above noted the scope of the original act was enlarged so as to include all cars *"used on any railroad* engaged in interstate commerce," whether the cars were engaged in interstate commerce or not. Southern R. Co. v. United States, 222 U. S. 20, 32 S. Ct. 2, 56 L. Ed. 72–75; Moore v. Chesapeake & O. R. Co., 291 U. S. 205, 54 S. Ct. 402, 78 L. Ed. 755, 761; Texas & P. R. Co. v. Rigsby, 241 U. S. 33, 36 S. Ct. 482, 60 L. Ed. 874; Louisville & N. R. Co. v. Layton, 243 U. S. 617, 37 S. Ct. 456, 61 L. Ed. 931.

The next Safety Appliance Act [36 Stat. at L. 298, chapter 160], approved April 14, 1910, was "An Act To supplement" the original act, "and other safety appliance Acts, and for other purposes." Section 1 thereof stated that the provisions of this act shall apply to every common carrier and every vehicle subject to the act of March 2, 1893, as amended April 1, 1896, and March 2, 1903, "commonly known as the 'Safety Appliance Acts.' "

Section 2 provided that on and after July 1, 1911:

"* * * it shall be unlawful for any common carrier subject to the provisions of this Act to haul, or permit to be hauled or used on its line any car subject to the provisions of this Act not equipped with appliances provided for in this Act, to wit: All cars must be equipped with secure sill steps and efficient hand brakes; all cars requiring secure ladders and secure running boards shall be equipped with such ladders and running boards, and all cars having ladders shall also be equipped with secure hand holds or grab irons on their roofs at the tops of such ladders * * *."

Section 3 provides:

"That within six months from the passage of this Act the

Interstate Commerce Commission, after hearing, shall designate the number, dimensions, location, and manner of application of the appliances provided for *by section two of this Act* and *section four of the Act of March second, eighteen hundred and ninety-three* * * *.'' (Italics supplied.) The act further provided that for good cause an extension of time would be granted any carrier to enable it to comply with the act.

You will look in vain through any of these acts for any expression or implication that a platform on a caboose was intended by the acts or by Congress to be a safety appliance or within the scope of the acts. Nothing in the acts indicates that the unmentioned caboose platform was classed with a sill step, a grab iron, a handhold, or a side or end ladder, as a safety appliance. There is no ''prescription'' in any of the acts that a caboose, either with or without two platforms, or with but one platform, shall be a standard or model for future construction. Neither does any of the acts give any authority to the Interstate Commerce Commission to prescribe any such caboose as a standard or model, beyond police-power regulation by any state. On the contrary, its power was expressly limited by section 3 of the Act of April 14, 1910, to designating ''the number, dimensions, location, and manner of application of the appliances provided for by section two'' of the same act (that is, sill steps, hand brakes, ladders, running boards, handholds and grab irons), and the appliances provided for by ''section four of the Act of March second, eighteen hundred and ninety-three'' (that is, ''grabirons or handholds in the ends and sides of each car for greater security to men in coupling and uncoupling cars).''

And, as will be noted in the order of the Commission which is set out below, that body followed the instructions given to it in section 3 of the Act of April 14, 1910, strictly and implicitly, and nowhere mentioned a caboose platform as a safety appliance or designated the ''number, dimensions, location, and manner of application'' of a platform on a caboose. If a caboose platform is a safety appliance, as the trustees and the trial court insist, and should be attached to a caboose as a handhold, ladder, or grab iron is attached, just how and where is a platform to be

attached to a caboose which already has one on each end? And furthermore, if, as the trustees say, a platform on a caboose is a safety-appliance requirement of the Safety Appliance Acts and of the order of the Interstate Commerce Commission, then the trustees are violating not only the Iowa statute but also said acts and order by not attaching platforms, as safety appliances, to the platformless ends of their nineteen cabooses of which complaint has been made. They seek to avoid such a dilemma by contending that the Interstate Commerce Commission made a "prescription" standardizing, as models, cabooses with platforms at each end, and cabooses without any platforms, but with side-door entrances, simply by drawing outlines of them for another purpose entirely; and furthermore they contend that, by inferences, which they say are "implicit" in what is just mentioned, the commission also made the Rock Island Railway Company's one-platform caboose standard, although it is not mentioned nor is there any drawing of it in the commission's order. Apparently the commission never heard of this abbreviated caboose, the existence of which is without any apparent reason, except that it can be built more cheaply than a two-platform caboose. Certainly the Interstate Commerce Commission cannot, within reason, be said to have prescribed as "standard" a caboose, different from any known caboose, which did not come into existence, so far as this record shows, until "late in the year 1940," over thirty years after the conjectured "prescription" was supposed to have been made.

Pursuant to the requirements of section 3 of the Act of April 14, 1910, the Interstate Commerce Commission issued its order of March 13, 1911, entitled, "United States Safety Appliance Standards."

Before setting out the order your observation and attention are called to the fact that the appliances referred to generally in the first two lines of the order, and thereafter particularly described in the body of the order, are strictly and specifically limited to the particular safety appliances named in the original act and the first amendment.

The order begins:

"It is ordered, That the number, dimensions, location, and manner of application of the *appliances provided for* by section

*two of the Act of April 14, 1910,* and section *four of the Act of March 2, 1893* [italics supplied], shall be as follows:"

Here are listed the safety appliances which are to be attached to a boxcar, giving their number, location, dimensions, material of which made, and manner of application. They are just as listed in the acts, to wit, hand brakes, grab irons or handholds, sill steps, running boards (on top of car), ladders, roof-handholds, side-handholds, horizontal end-handholds, vertical end-handholds, uncoupling levers.

Note the particularity of the following directions respecting a hand brake:

"Dimensions.—The brake shaft shall be not less than one and one-fourth inches in diameter, of wrought iron or steel without weld. The brake wheel may be flat or dished, not less than fifteen, preferably sixteen inches in diameter, of malleable iron, wrought iron or steel.

"Location.—The hand brake shall be so located that it can be safely operated while car is in motion. The brake shaft shall be located on the end of car, to the left of and not less than seventeen nor more than twenty-two inches from the center."

The following is a short excerpt from long, detailed directions of the manner of application of the hand brake:

"Brake chain shall be of not less than three-eighths, preferably seven-sixteenths inch, wrought iron or steel, with link on the brake-rod end of not less than seven-sixteenths, preferably one-half inch, wrought iron or steel, and shall be secured to brake-shaft drum by not less than one-half inch hexagon or square-headed bolt. Nut on said bolt shall be secured by riveting end of bolt over nut. * * *

"Sill Steps: Number.—Four.

"Dimensions.—Minimum cross-sectional area one-half by one and one-half inches, or equivalent, of wrought iron or steel. Minimum length of tread, ten, preferably twelve, inches. Minimum clear depth, eight inches.

"Location.—One near each end on each side of car, so that there shall be not more than eighteen inches from end of car to center of tread of sill step. Outside edge of tread of step shall

be not more than four inches inside of face of side of car, preferably flush with side of car. Tread shall be not more than twenty-four, preferably not more than twenty-two, inches above the top of rail.''

The excerpts are typical of the directions in the commission's order of March 13, 1911, with respect to the number, dimensions, material, and manner of application, of the other safety appliances (grab irons, handholds, ladders, running boards, uncoupling levers) specifically designated in section 4 of the Act of March 2, 1893, and section 2 in the Act of April 14, 1910, and their location upon every type of railway rolling stock, to wit: box and other house cars, hopper cars, and high-side gondolas with fixed ends, drop-end high-side gondola cars, fixed-end low-side gondola and low-side hopper cars, drop-end low-side gondola cars, flatcars, tank cars with side platforms, tank cars without side-sills and tank cars with short side-sills and end platforms, tank cars without end-sills, caboose cars with platforms, caboose cars without platforms, passenger train cars with wide vestibules, passenger train cars with open end platforms, passenger train cars without end platforms, steam locomotives used in road service, tender of locomotive used in road service, steam locomotives used in switching service, tender of steam locomotive used in switching, tenders of Vanderbilt type.

The commission had no authority to designate any appliance or equipment as a safety appliance without the specific authority of Congress so to do. It was given no such authority. When the particularity of the directions with respect to a simple sill step is noted, one would expect the same detailed directions as to the dimensions, material, and manner of construction of a caboose platform would have been given if the commission had any thought that it was a safety appliance. No such directions were given. And since the commission was authorized and directed only as to equipment of, and, on ''cars,'' as noted in the title to the first Safety Appliance Act, it is beyond reasonable supposition that it intended to and did either expressly, impliedly, or ''implicitly,'' by ''prescription,'' standardize cabooses and other types of rolling stock.

As a part of the commission's order of March 13, 1911, and merely to illustrate the text of the printed directions noted

822

herein and to show the location of and attachment of the various safety appliances are general outlines or drawings of the side, end; and top views of each of the above-listed railway vehicles. The commission's order with the text of directions and the illustrative drawings are in the booklet entitled, "United States Safety Appliances For All Classes Of Cars And Locomotives," revised to January 1, 1935, and issued by the Association of American Railroads (Exhibit 3 in the record) and in Richey's Federal Employers' Liability, Safety Appliance and Hours of Service Acts, second Edition. The Safety Appliance Acts are in 45 U.S.C., chapter 1. None of these drawings are standards, models, or blueprints and specifications drawn to scale and detail, to notify and instruct the railroad companies how to construct standardized vehicles allegedly required by the Acts of Congress or the orders of the Interstate Commerce Commission. They were never intended to be such. No such requirements have ever been made by either body. There has never been a time since railroad transportation became the enormous business which it is and has been for many years, with its possession of vast equipment, that any such requirements could have been enforced without wrongful and unnecessary destruction of its property.

Set out herein are cuts of the general outline drawings in the commission's order of March 13, 1911, showing a side view, (marked A) and an end view (marked B) of a caboose which has no platforms, but instead has a side entrance and a single suspended step just below the entrance. Presumably there is such an entrance on each side of the caboose, but the order and the record are silent on the matter.

Below these, herein, are a side view (marked C) and an end view (marked D) of the ordinary, well-known two-end-platform caboose. The lettered directions as to the safety appliances are omitted from these cuts, but the grab irons, handholds, ladders, sill steps, hand brakes, running boards, etc., can be seen.

If, as the trustees urge, the drawings of the two types of cabooses make them "standard," then by the same "implicit" deduction the drawings of every other type of railroad vehicles in the order makes each drawing a "standard" of its particular type. The court may take judicial notice from its observation of

A    B

C    D

→the non-uniformity of cars in freight trains during the thirty or more years since the said order became effective that no such standardization has ever been enforced.

I.    The Iowa State Commerce Commission is a body established by legislative act to have general supervision of the railroads and other common carriers operating in the state. It has duties with respect to the enforcement of legislation applying particularly to transportation as conducted by these carriers. Section 7972 of the 1939 Code of Iowa is a part of chapter 371, entitled the ''Construction and Operation of Railways.'' With the wisdom or propriety of section 7972 and the particular provision thereof involved in this proceeding neither this nor any other court has anything to do. It is a matter of legislation and

legislative judgment belonging to the legislative department of government.´ As said by Mr. Chief Justice Hughes, in Townsend v. Yeomans, 301 U. S. 441, 451, 57 S. Ct. 842, 847, 81 L. Ed. 1210, 1219:

"But the legislature, acting within its sphere, is presumed to know the needs of the people of the State. Whether or not special inquiries should be made is a matter for the legislative discretion."

In Atlantic Coast Line R. Co. v. State of Georgia, 234 U. S. 280, 287, 34 S. Ct. 829, 830, 58 L. Ed. 1312, 1316, the company challenged the right of the state to enact a statute requiring the main-line locomotives to be equipped with electric headlights of a specified wattage and size as a denial of its right of contract and a deprivation of its property without due process of law. Mr. Justice Hughes, speaking for the court, said:

"The legislature may require an adequate headlight, and whether the carrier's practice is properly conducive to safety, or a new method affording greater protection should be substituted, is a matter for the legislative judgment. * * * This argument ignores the established principle that if its action is not arbitrary—is reasonably related to a proper purpose—the legislature may select the means which it deems to be appropriate to the end to be achieved."

The principle is thus stated in Sproles v. Binford, 286 U. S. 374, 388, 52 S. Ct. 581, 585, 76 L. Ed. 1167, 1179, Mr. Chief Justice Hughes, delivering the opinion:

"When the subject lies within the police power of the State, debatable questions as to reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome."

It is proper for the court to determine whether the legislative provision here challenged meets the test just stated. Clearly it does. It was adopted thirty-four years ago and the record fairly shows that it was not violated by any railroad until the cross-appellants did so in 1940. Counsel for the commission stated in

its opening printed argument that no other railroad company has used in Iowa a caboose with but one end platform and the trustees have not denied the statement. Section 7972 calls for a caboose with a platform at each end—the kind of which the court may take judicial notice is now and has been commonly used. If all other railroads operating in the state use it, and the cross-appellant employs such a caboose on all of its trains except the nineteen which it uses on some branch lines, no further argument should be needed to establish that it is a proper and safe instrumentality of interstate commerce and that its use is good railroading. If a caboose with a platform on but one end is a safe platform—a fact which the cross-appellants cannot consistently deny in view of their use of it—then one with a platform on each end must be, without question, much safer and more convenient, perhaps one hundred per cent.

The Reports contain many cases in which judgments have been sustained against the owners or lessees of buildings open to the public where the person injured or killed has opened an unguarded or unlocked door, unsuspecting that there was no place to set his foot on the other side of the door. Under the record in this case a passenger in a caboose might reasonably be justified in thinking there was a platform at each end of the car, and step off to his death or serious injury. The work of trainmen, particularly those who work from the caboose, is ordinarily hazardous. They are exposed to inclement weather, when their footing is uncertain because of uneven ground, and snow, water, and ice, and the darkness, and when the train equipment is slippery. Their work is hurried and their movements must often be made quickly and with little time for observation. If two or three of them have to board the caboose hurriedly, when the train is moving and they are close together, it would be much safer and greatly to their convenience if there were two platforms on the caboose instead of but one. The observance of signals or of approaching trains from the rear of a train is often quite important and it can be done more efficiently if there is a rear platform. Under all circumstances the presence of a platform on each end of the caboose tends to promote the comfort, convenience, and safety of the trainmen and others who may be lawfully riding in the caboose. The absence of an end platform

appears to benefit no one but the company, and that only in the reduced cost of the caboose, which, under the circumstances, is hardly worthy of consideration in the determination of this appeal. The action of the state cannot be said to be arbitrary or unreasonable or not fairly related to the purpose to be achieved.

II. It quite definitely appears that the parties have reduced their points of controversy to one proposition. The commissioners in their opening printed argument stated that it was admitted by the parties that in the event it was determined the Safety Appliance Acts have invaded the field of legislation and are applicable to the issues involved, then section 7972 is invalid. They further state:

"It is also admitted, as we understand it, that in the event that the National Safety Appliance Acts have not invaded the field, that Section 7972, Code, 1939, is enforceable against [the operation of cross-appellants' one-platform cabooses] whether engaged in interstate commerce or not."

No express denial of this contention appears.

In Oregon-Washington R. & Nav. Co. v. State of Washington, 270 U. S. 87, 101, 46 S. Ct. 279, 283, 70 L. Ed. 482, 488, there was an appeal from a decree affirming a decree enjoining the importation by the company of diseased alfalfa, alleged to be contrary to a state statute. The United States Supreme Court reversed upon the ground that the statute had been superseded by a congressional act covering the same general ground as the statute. Mr. Chief Justice Taft delivered the opinion. It said:

"In the relation of the States to the regulation of interstate commerce by Congress there are two fields. There is one in which the State cannot interfere at all, even in the silence of Congress. In the other, (and this is the one in which the legitimate exercise of the State's police power brings it into contact with interstate commerce so as to affect that commerce,) the State may exercise its police power until Congress has by affirmative legislation occupied the field by regulating interstate commerce and so necessarily has excluded state action."

A similar contention has been presented throughout this proceeding, from the hearings before the commission and the district court, and on this appeal. The trustees have made and

now make no claim based upon a contravention of the commerce clause of the Constitution itself, and of its own force, unimplemented by any congressional action, but they have taken their stand on the single ground that the particular provision complained of in section 7972 has been superseded and rendered of no force by the affirmative action of Congress in the enactment of the Safety Appliance Acts. That single contention and the concession adverted to in the beginning of this division simplifies the task of the court.

III. Whether Congress did invade and occupy the field of the subject matter involved is an issue of fact. And it is a fact which alone compels a finding adverse to the cross-appellants. But the decision need not rest alone on that finding. The decisions of the United States Supreme Court support that finding and decisively compel a conclusion of law adverse to the cross-appellants.

There is no issue in this case, nor can there be in any case involving rights under the commerce clause, of the power of Congress under it. The question before this court is whether it has been exercised. The courts, both state and federal, are unanimous in holding that the *power* of Congress to regulate interstate commerce is plenary and without limitation. And that power is unaffected by the police power of the states, and where the two powers come into collision the police power must yield the way. Gibbons v. Ogden (1824), 9 Wheat. (U. S.) 1, 6 L. Ed. 23, 73; United States v. State of California, 297 U. S. 175, 56 S. Ct. 421, 80 L. Ed. 567, 573; Southern Pacific Co. v. State of Arizona, 325 U. S. 761, 65 S. Ct. 1515, 89 L. Ed. 1915, 1922, 1925; State of California v. Thompson, 313 U. S. 109, 113, 114, 61 S. Ct. 930, 85 L. Ed. 1219, 1221, 1222; South Carolina State Highway Dept. v. Barnwell Bros., 303 U. S. 177, 187, 58 S. Ct. 510, 82 L. Ed. 734, 740; Minnesota Rate Cases (Simpson v. Shepard), 230 U. S. 352, 399, 400, 33 S. Ct. 729, 57 L. Ed. 1511, 1541, 1542, 48 L. R. A., N. S., 1151, Ann. Cas. 1916A, 18.

In Chicago, R. I. & P. R. Co. v. State of Arkansas, 219 U. S. 453, 466, 31 S. Ct. 275, 279, 55 L. Ed. 290, 296, Mr. Justice Harlan, delivering the opinion, said:

"Undoubtedly, Congress in its discretion, may take entire charge of the whole subject of the equipment of interstate cars, and establish such regulations as are necessary and proper for the protection of those engaged in interstate commerce."

And, as said by the great judge, in Atlantic Coast Line R. Co. v. State of Georgia, 234 U. S. 280, 291, 34 S. Ct. 829, 831, 58 L. Ed. 1312, 1318:

"The requirements of a State, of course, must not be arbitrary or pass beyond the limits of a fair judgment as to what the exigency demands, but they are not invalid because another State in the exercise of a similar power may not impose the same regulation."

In Gibbons v. Ogden, supra, 9 Wheat. (U. S.) 1, 86, 90, 6 L. Ed. 23, 70, 72, Mr. Chief Justice Marshall, speaking of the power of Congress under the commerce clause, said:

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution. * * * In our complex system, presenting the rare and difficult scheme of one general government, whose action extends over the whole, but which possesses only certain enumerated powers, and of numerous state governments, which retain and exercise all powers not delegated to the Union, contests respecting power must arise."

But, notwithstanding the exclusive nature of this power granted to Congress, it is the uniform holding of the United States Supreme Court that the grant of power in the commerce clause did not wholly withdraw from the states the authority, in the exercise of their police powers, where Congress has not spoken, to make regulations concerning matters local to the state, which affect the health, morals, convenience, or safety of those within their territorial jurisdiction and affect interstate commerce only indirectly and incidentally. Parker v. Brown, 317 U. S. 341, 63 S. Ct. 307, 87 L. Ed. 315, 331; Southern Pacific Co. v. State of Arizona, supra, 325 U. S. 761, 65 S. Ct. 1515, 89 L. Ed. 1915, 1923; State of California v. Thompson, supra,

313 U. S. 109, 113, 114, 61 S. Ct. 930, 85 L. Ed. 1219, 1221, 1222;
Minnesota Rate Cases (Simpson v. Shepard), supra, 230 U. S.
352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A., N. S., 1151, Ann.
Cas. 1916A, 18; South Carolina State Highway Dept. v. Barn-
well Bros., supra, 303 U. S. 177, 187, 625, 58 S. Ct. 510, 82
L. Ed. 734, 740; Duckworth v. State of Arkansas, 314 U. S.
390, 62 S. Ct. 311, 86 L. Ed. 294, 138 A. L. R. 1144. As said
in Adams Express Co. v. Croninger, 226 U. S. 491, 500, 33
S. Ct. 148, 149, 57 L. Ed. 314, 318, 44 L. R. A., N. S., 257,
through Mr. Justice Lurton:

"Such regulations would fall within that *large class of
regulations* which it is competent for a State to make in the
absence of legislation by Congress, growing out of the terri-
torial jurisdiction of the State over such carriers and *its duty*
and *power* to safeguard the general public against acts of mis-
feasance and nonfeasance committed within its limits, although
interstate commerce may be indirectly affected." (Italics sup-
plied.)

Such state regulations remain in force until superseded by
congressional action in the particular subject matter and the
supersedence must be by specific provisions. Speaking through
Mr. Justice Brewer, the court, in Missouri Pac. R. Co. v. Lara-
bee Flour Mills Co., 211 U. S. 612, 623, 29 S. Ct. 214, 218,
53 L. Ed. 352, 361, said:

"Until *specific action* by Congress or the commission the
control of the State over these incidental matters remains un-
disturbed."

And in Southern R. Co. v. Reid, 222 U. S. 424, 437, 32
S. Ct. 140, 142, 56 L. Ed. 257, 260, Mr. Justice McKenna de-
livering the opinion, the court said:

"The principle of that case [Missouri Pac. R. Co. v. Lara-
bee Flour Mills Co., supra, 211 U. S. 612, 29 S. Ct. 214, 53
L. Ed. 352, 361], therefore, *requires us to find specific action*
either by Congress in the Interstate Commerce Act or by the
Commission covering the matters which the statute of North
Carolina attempts to regulate." (Italics supplied.)

In Morris v. Duby, 274 U. S. 135, 144, 47 S. Ct. 548, 550, 71 L. Ed. 966, 971, 972, Mr. Chief Justice Taft quoted from the opinion of Mr. Justice Brandeis in Buck v. Kuykendall, 267 U. S. 307, 315, 45 S. Ct. 324, 325, 69 L. Ed. 623, 626, 38 A. L. R. 286:

" 'State regulation [limiting the weight and width of motor trucks] of that character is valid even as applied to interstate commerce, in the absence of legislation by Congress *which deals specifically with the subject.*' " (Italics supplied.)

Mr. Justice Holmes, in Charlestown & Western Carolina Ry. Co. v. Varnville Furniture Co., 237 U. S. 597, 604, 35 S. Ct. 715, 717, 59 L. Ed. 1137, 1140, Ann. Cas. 1916D, 333, states that the Federal Act supersedes the state regulation "when Congress has taken the *particular subject matter in hand* * * *." In Missouri, K. & T. R. Co. v. Harris, 234 U. S. 412, 34 S. Ct. 790, 792, 58 L. Ed. 1377, 1381, L. R. A. 1915E, 942, Mr. Justice Pitney, delivering the opinion, said:

"But, it is equally well settled that the mere creation of the Interstate Commerce Commission, and the grant to it of a measure of control over interstate commerce, does not of itself, *and in the absence of specific action* by the Commission or by Congress itself, interfere with the authority of the States * * *." (Italics supplied.)

IV. The cross-appellants are forced to concede by the plain provisions of the Safety Appliance Acts and of the commission's order of March 13, 1911, that their contention, on which they rely for affirmance, that a caboose platform is a safety appliance under the acts and the order, and that the order has prescribed their caboose as standard must be sustained by inference and implication only and not by any express statement. Such a contention and the theory on which it is based runs squarely counter to a principle announced and followed by a host of decisions of the United States Supreme Court, with no *decision* of that court to the contrary. That principle is that the police power of a state, when exercised within the broad scope of that power in the protection of the health, morals, convenience, or safety of its citizens or of those

within its territorial jurisdiction, will not be superseded or suspended by act of Congress or of any body created by it unless its purpose to effect that result is *clearly manifested and the conflict or repugnance between such act and that of the state is so direct and positive that the two cannot be reconciled or stand together.* And further, where, as in this case, inference and implication are relied on, such deduction will not be permitted unless, *"when fairly interpreted,"* the federal action is clearly and plainly in conflict or is inconsistent with the state regulation on the same specific subject.

This principle, in an applicable case, was fully discussed by Mr. Chief Justice Hughes, in Kelly v. Washington, 302 U. S. 1, 9, 58 S. Ct. 87, 92, 82 L. Ed. 3, 10 et seq.:

"Under our constitutional system, there necessarily remains to the States, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. Minnesota Rate Cases [Simpson v. Shepard], 230 U. S. 352, 402, 33 S. Ct. 729 [57 L. Ed. 1511, 1542, 48 L. R. A., N. S., 1151, Ann. Cas. 1916A, 18]. States are thus enabled to deal with local exigencies and to exert in the absence of conflict with federal legislation an essential protective power. *And when Congress does exercise its paramount authority, it is obvious that Congress may determine how far its regulation shall go. There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field and otherwise admissible is not forbidden or displaced. The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'"* (Citing numerous cases. Italics supplied.)

█ The italicized words in quotation just above state a principle which is most applicable to the case on appeal. In this case Congress definitely and clearly circumscribed and

limited the safety appliances by specifically naming them. The subject matter, making the use of cabooses with but one end platform unlawful, is unmistakably without and beyond the scope of the Safety Appliance Acts.

In Kelly v. Washington, supra, the question involved was whether a statute of Washington requiring the inspection of the hull and machinery of motor-driven tugs was superseded by a Federal Act regulating motor-driven vessels. The latter Motor Boat Act was applicable to the respondents' tugs, to a certain extent, but its scope was held to be too restricted to include them. The decision of the supreme court was reversed and the state statute was held valid and applicable.

In Reid v. Colorado, 187 U. S. 137, 147, 23 S. Ct. 92, 96, 47 L. Ed. 108, 114, a statute of Colorado made it unlawful to import cattle into the state from south of the thirty-sixth parallel of north latitude except upon certain conditions, one of which was a certificate of a state board of veterinary that the cattle were free from disease. Appellant, who was convicted of not complying with the statute, urged that the statute was superseded by the Federal Act entitled, "An Act for the establishment of a Bureau of Animal Industry, to prevent the exportation of diseased cattle, and to provide means for the suppression and extirpation of pleuro-pneumonia, and other contagious diseases among domestic animals." 23 Stat. at L. 31, chapter 60. He had a certificate that the cattle were free from disease, issued under the Federal Act, but he had none under the statute. His conviction was upheld. Mr. Justice Harlan, speaking for the court, said:

"But the difficulty with the defendant's [Reid] case is that Congress has not by any statute covered the whole subject of the transportation of livestock among the several States, and; except in certain particulars not involving the present issue, has left a wide field for the exercise by the States of their power, by appropriate regulations, to protect their domestic animals against contagious, infectious and communicable diseases. * * * *It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the States, even when it may do so, unless its purpose to effect that result is clearly manifested.*

This court has said—and the principle has been often reaffirmed—that 'in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together.' Sinnot v. Davenport, 22 How. 227, 243 [16 L. Ed. 243, 247]."

It certainly cannot fairly be said that the intent of Congress in the Safety Appliance Acts to supersede the Iowa statute was "clearly manifested." The manifestation is clear that there was no intention to supersede said section 7972. Neither is there such repugnance nor conflict that the two enactments cannot be reconciled and stand together without conflict.

The case of Atlantic Coast Line R. Co. v. State of Georgia, supra, 234 U. S. 280, 293, 34 S. Ct. 829, 832, 58 L. Ed. 1312, 1318, involved a statute of Georgia which required railway locomotives running on the main lines to be equipped with electric headlights of a certain wattage and size. The railroad contended that the statute violated the due-process and the equal-protection clauses of the Constitution, and was an unwarrantable interference with interstate commerce. It also argued that Congress had acted in the matter by the adoption of the following statutes: the three Safety Appliance Acts, one of which provided for power driving-wheel brakes and grab irons, handholds, etc., on locomotives; the Act of May 27, 1908, 35 Stat. at L. 324, authorizing the Interstate Commerce Commission to keep informed regarding compliance with the safety appliance acts, and to investigate and report on the need of any appliances or systems intended to promote the safety of railway operations; the Act of May 30, 1908, relating to locomotive ashpans; *"to the detailed regulations prescribed by the Commission, on March 13, 1911, pursuant to this authority;" (the Safety Appliance Act of April 14, 1910);* "to the Act of May 6, 1910 * * * requiring the Commission to investigate accidents and make report as to their causes with such recommendations as they may deem proper; and to the Act of February 17, 1911, c. 103, 36 Stat. 913

[U. S. Comp. Stat. Supp., 1911, 1333], relating to locomotive boilers.'' (Italics supplied.)

The italicized quotation above set out is the order of the Interstate Commerce Commission of March 13, 1911, upon which the trustees in the appeal before us so strongly rely. It is the order directing the railroads specifically as to the attaching of the specified safety appliances to the various designated rolling stock, among them being cabooses with and without platforms, tenders, locomotives for road work, and locomotives for switching. It is the order which contained the plates of drawings of these various vehicles. The appellees in the appeal at bar insist that this order and the directions and the drawings of the cabooses are ''prescriptions'' for these cabooses, and also for their own one-end-platform cabooses, and are ''implicit'' in showing the approval of these three types of cabooses as ''standard.'' If this be true as to appellees' cabooses, a fortiori, it should be true of the locomotive of the Atlantic Coast Line Railroad, for there was a drawing of ''a mainline'' locomotive with the directions, but Mr. Justice Hughes, who delivered the opinion, had no such idea, for he said, 234 U. S. 280, 293, 34 S. Ct. 829, 832, 58 L. Ed. 1312, 1319: ''But it is manifest that none of these acts provides regulations for locomotive headlights.'' Neither did they provide any regulations for caboose platforms nor for cabooses.

The opinion continues:

''It does not appear, however, either that Congress has acted or that the Commission under the authority of Congress has established any regulation so far as headlights are concerned. As to these, the situation has not been altered by any exertion of Federal power and the case stands as it has always stood without regulation unless it be supplied by local authority. The most that can be said is that inquiries have been made, but that Congress has not yet decided to establish regulations, either directly or through its subordinate body, as to the appliance in question. *The intent to supersede the exercise of the State's police power with respect to this subject cannot be inferred from the restricted action which thus far has been taken.*'' (Italics supplied.)

In that case, as in this one, the railroad company sought to bring locomotive headlights within the purview of the Safety Appliance Acts, which had to do with power brakes, grab irons, and handholds on locomotives, and of the Locomotive Boiler Inspection Act, but the court held that neither the Congress nor the commission had "directly" attempted to regulate headlights. Certainly, locomotive headlights are more essential to the safety of train employees and to the public than a caboose platform, but the court, after carefully analyzing all of the pertinent congressional acts, by decision, without obiter comment, determined the very matter at issue adversely to the company's contention.

In Plumley v. Massachusetts, 155 U. S. 461, 479, 15 S. Ct. 154, 161, 39 L. Ed. 223, 230, involving a statute of the state which prevented the importing of oleomargarine colored to imitate butter, Mr. Justice Harlan said:

"* * * the judiciary of the United States should not strike down a legislative enactment of a State—especially if it has direct connection with the social order, the health, and the morals of its people—*unless such legislation plainly and palpably violates some right granted or secured by the national Constitution or encroaches upon the authority delegated to the United States* for the attainment of objects of national concern." (Italics supplied.)

In Illinois Central R. R. Co. v. State Public Utilities Commission of Illinois, 245 U. S. 493, 510, 38 S. Ct. 170, 176, 62 L. Ed. 425, 438, speaking through Mr. Justice Van Devanter, the court said:

"In construing federal statutes enacted under the power conferred by the commerce clause of the Constitution the rule is that it should never be held that Congress intends to supersede or suspend the exercise of the reserved powers of a State, even where that may be done, *unless, and except so far as, its purpose to do so is clearly manifested.* [Citing decisions in support.] This being true of an act of Congress, *it is obvious that an order of a subordinate agency, such as the Commission, should not be given precedence over a state rate statute otherwise valid, unless, and except so far as, it*

*conforms to a high standard of certainty.* We conclude that the uncertainty in this order [of the Commission] is such as to render it inoperative and of no effect * * *." (Italics supplied.)

Lehigh Valley R. Co. v. Board of Public Utility Commissioners, 278 U. S. 24, 35, 49 S. Ct. 69, 72, 73 L. Ed. 161, 167, 62 A. L. R. 805, involved an appeal from the Federal District Court of New Jersey dismissing bills of plaintiffs to enjoin the enforcement of an order of defendants requiring the elimination of grade highway crossings. Mr. Chief Justice Taft wrote the opinion, which said:

"The care of grade crossings is peculiarly within the police power of the States * * * It was certainly not intended by the Transportation Act to take from the States, or to thrust upon the Interstate Commerce Commission, investigation into parochial matters like this, unless * * * their general bearing is clear."

In International Shoe Co. v. Pinkus, 278 U. S. 261, 265, 49 S. Ct. 108, 110, 73 L. Ed. 318, 320, Mr. Justice Butler spoke for the court, saying:

"The general rule is that an intention wholly to exclude state action will not be implied unless, *when fairly interpreted, an Act of Congress is plainly in conflict with state regulation of the same subject.*" (Italics supplied.)

Mintz v. Baldwin, 289 U. S. 346, 350, 53 S. Ct. 611, 613, 77 L. Ed. 1245, 1249, involved a statute of New York prohibiting the importation of cattle with Bang's disease. Plaintiff appealed from the decree of the Federal District Court for the Northern District of New York dismissing his bill to enjoin the enforcement of the state commissioner's order against the shipment. It was his contention that the statute was superseded by the Congressional Cattle Contagious Diseases Acts of February 2, 1903. Mr. Justice Butler delivered the opinion, saying:

"*The purpose of Congress to supersede or exclude state action against the ravages of the disease is not lightly to be*

*inferred. The intention so to do must definitely and clearly appear.*" (Italics supplied.)

In Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U. S. 740, 749, 62 S. Ct. 820, 825, 86 L. Ed. 1154, 1164, Mr. Justice Douglas spoke for the court. In holding for the state, the court said:

"Furthermore, this Court has long insisted that an 'intention of Congress to exclude States from exerting their police power must be clearly manifested.' [Citing authorities.] Congress has not made such employee and union conduct as is involved in this case subject to regulation by the federal Board. * * * We will not lightly infer that Congress by the mere passage of a federal Act has impaired the traditional sovereignty of the several States in that regard. * * * Since the state system of regulation, as construed and applied here, can be reconciled with the federal Act and since the two as focused in this case can consistently stand together, the order of the state Board must be sustained under the rule which has long obtained in this Court. See Sinnot v. Davenport, 22 How. [U. S.] 227, 243 [16 L. Ed. 243, 247]. In sum, we cannot say that the mere enactment of the National Labor Relations Act, without more, excluded state regulation of the type which Wisconsin has exercised in this case."

In Southern Pacific Co. v. State of Arizona, supra, 325 U. S. 761, 766, 65 S. Ct. 1515, 1518, 89 L. Ed. 1915, 1922, in which Chief Justice Stone delivered the majority opinion, the court said:

"Congress, in enacting legislation within its constitutional authority over interstate commerce, will not be deemed to have intended to strike down a state statute designed to protect the health and safety of the public unless its purpose to do so is clearly manifested * * *."

Other decisions sustaining the proposition stated at the head of Division IV hereof are: Savage v. Jones, 225 U. S. 501, 32 S. Ct. 715, 56 L. Ed. 1182, 1191–1194, holding that

an Indiana statute requiring a statement as to the ingredients of a stock food was not superseded by the National Food and Drug Act, 21 U. S. C., section 1 et seq., against misbranding and adulteration; Carey v. State of South. Dakota, 250 U. S. 118, 122, 39 S. Ct. 403, 63 L. Ed. 886, 888, holding state statute against shipping game birds was not superseded by Federal Migratory Bird Act, 16 U. S. C., section 703 et seq.; Cummings v. Chicago, 188 U. S. 410, 23 S. Ct. 472, 47 L. Ed. 525, 531, holding that state authority to prohibit erection of a structure in a navigable river without state permission was not superseded by the Federal River and Harbor Act, 30 Stat. 1121; Gilvary v. Cuyahoga Valley R. Co., 292 U. S. 57, 54 S. Ct. 573, 78 L. Ed. 1123, 1126; Maurer v. Hamilton, 309 U. S. 598, 60 S. Ct. 726, 84 L. Ed. 969, 974, 980, 135 A. L. R. 1347, a statute of Pennsylvania, 75 P. S., section 642(c), against trucks loaded with motor vehicles was held not in conflict with rules of the Interstate Commerce Commission promulgated under the Motor Carrier Act, 49 U. S. C., section 301 et seq.; H. P. Welch v. New Hampshire, 306 U. S. 79, 85, 59 S. Ct. 438, 441, 83 L. Ed. 500, 505, which held: "* * .* it cannot be inferred that Congress intended to supersede any state safety measure prior to the taking effect of a federal measure found suitable to put in its place. Its purpose to displace the local law must be definitely expressed." See, also, First Iowa Hydro-Electric Cooperative v. Federal Power Comm., 80 U. S. App. D. C. 211, 151 F. 2d 20; Missouri, K. & T. R. Co. v. Haber, 169 U. S. 613, 18 S. Ct. 488, 42 L. Ed. 878, 881, in which a state quarantine law was held not to be in conflict with the Federal Animal Industry Act, 23 Stat. at L. 31; Atchison, T. & S. F. R. Co. v. Railroad Commission of California, 283 U. S. 380, 51 S. Ct. 553, 75 L. Ed. 1128; Missouri Pac. R. Co. v. Norwood, 283 U. S. 249, 51 S. Ct. 458, 75 L. Ed. 1010, 1017. Vandalia R. Co. v. Public Service Commission of Indiana, 242 U. S. 255, 37 S. Ct. 93, 61 L. Ed. 276, 285, involved a statute of Indiana requiring locomotives to be equipped with headlights of 1,500 candle power, which was upheld since the decision of the state court was rendered before the Loco-

motive Boiler Inspection Act was amended to include every part of a locomotive, by the Act of March 4, 1915.

Napier v. Atlantic Coast Line R. Co., 272 U. S. 605, 606, 47 S. Ct. 207, 71 L. Ed. 432, 436, 437, 438, relied upon by cross-appellants, in reality sustains the appellants' contention. It involved a Georgia statute requiring automatic doors to locomotive fireboxes, and a Wisconsin statute requiring cab curtains on locomotives. The Georgia case was appealed from a final decree of a federal district court of December 23, 1924, enjoining the enforcement of the statute. (2 F. 2d 891.) The United States Supreme Court affirmed this decision. The other two cases were heard on writs of error to the Wisconsin Supreme Court which affirmed a decree denying the injunction. (Chicago & N. W. R. Co. v. Railroad Commission of Wisconsin, 188 Wis. 232, 205 N. W. 932.) The United States Supreme Court reversed this decree.

Mr. Justice Brandeis, delivered the opinion of the Court, saying:

"These cases require a determination of the scope and effect of the federal Locomotive Boiler Inspection Act. February 17, 1911 * * * as amended March 4, 1915 * * * and June 7, 1924 * * *. The main question, which is the same in the three cases, is one of statutory construction. It is whether the Boiler Inspection Act has occupied the field of regulating locomotive equipment used on a highway of interstate commerce, so as to preclude state legislation. Congress obviously has power to do so. [Citing decisions.] * * * Prior to the passage of the Boiler Inspection Act, Congress had, by the Safety Appliance Act and several amendments, itself made requirements concerning the equipment of locomotives used in interstate commerce. It had required a power driving-wheel brake, automatic couplers, grabirons or handholds, drawbars, safety ash pans, and sill steps. * * * Congress first conferred upon the Interstate Commerce Commission power in respect to locomotive equipment in 1911. *The original act applied only to the boiler.* * * * The provisions of that Act were extended in 1915 to *'include the entire locomotive and tender and all parts and appurtenances thereof.'* In 1924, §2 of the original Act was amended to read as follows: 'That

it shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless *said locomotive, its boiler, tender, and all parts and appurtenances thereof* are in proper condition and safe to operate in the service to which the same are put * * * and unless *said locomotive, its boiler, tender and all parts and appurtenances thereof have been inspected from time to time* in accordance with the provisions of this Act * * *. Other sections confer upon Inspectors and the Commission power to prescribe requirements and establish rules to secure compliance with the provisions of §2. From time to time since the passage of the original Act, the Commission has required that locomotives used in interstate commerce be equipped with various devices. But it has made no order requiring either a particular type of fire-box door or a cab curtain. Nor has Congress legislated specifically in respect to either device. * * * Each device was prescribed by the State primarily to promote the health and comfort of engineers and firemen. Each state requirement may be assumed to be a proper exercise of its police power, unless the measure violates the Commerce. Clause. It may be assumed, also, that there is no physical conflict between the devices required by the State and those specifically prescribed by Congress or the Interstate Commerce Commission; and that the interference with commerce resulting from the state legislation would be incidental only. *The intention of Congress to exclude States from exerting their police power must be clearly manifested.* [Citing decisions.] Does the legislation of Congress manifest the intention to occupy the entire field. of regulating locomotive equipment? *Obviously it did not do so by the Safety Appliance Act, since its requirements are specific.* * * * Atlantic Coast Line R. R. Co. v. Georgia, 234 U. S. 280 [58 L. Ed. 1312, 34 S. Ct. 829]. But the power delegated to the Commission by the Boiler Inspection Act *as amended is a general one. It extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances.* * * * The question whether the Boiler Inspection Act confers upon the Interstate Commerce Commission power to specify the sort of equipment to be used on locomotives was left open in Vandalia R. R.

Co. v. Public Service Commission, 242 U. S. 255 [61 L. Ed. 276, P. U. R. 1917B, 1004, 37 S. Ct. 93]. We think that power was conferred. The duty of the Commission is not merely to inspect. It is, also, to prescribe the rules and regulations by which fitness for service shall be determined." (Italics supplied.)

The decision in the Napier case definitely sustains the contentions of the appellants. It expressly sustains their position that the Safety Appliance Acts make only specific requirements: it designates only specific safety appliances. As the opinion states, "obviously it did not manifest the intention to occupy the entire field of regulating locomotive equipment." Neither did it manifest an intention to occupy the field of caboose equipment or construction. The decision also stresses that the original Locomotive Boiler Inspection Act was specific legislation. It covered only the boiler of the locomotive. Because it was specific and covered the boiler only, the United States Supreme Court, in Atlantic Coast Line R. Co. v. Georgia, supra, 234 U. S. 280, 34 S. Ct. 829, 58 L. Ed. 1312, and in Vandalia R. Co. v. Public Service Commission of Indiana, supra, 242 U. S. 255, 37 S. Ct. 93, 61 L. Ed. 276, held that the act did not supersede the statute of Georgia and the statute of Indiana requiring electric locomotive headlights of a specific candle power. It was only because of two amendatory acts converting the specific original act, applying only to the locomotive boiler, into a general act covering all parts and appurtenances of the locomotive and tender, that the decision in the Napier case held the Georgia statute requiring an automatic door to the firebox and the Wisconsin statute requiring cab curtains were superseded by the federal act.

In further comment upon the principle, the court, in Kelly v. Washington, supra, 302 U. S. 1, 13, 58 S. Ct. 87, 93, 82 L. Ed. 3, 12, 13, said:

"The application of the principle is strongly fortified where the State exercises its power to protect the lives and the health of its people. But the principle is not limited to cases of that description. It extends to exertions of state power directed to more general purposes. Thus it was applied in

sustaining the order of a state commission requiring inter-state carriers to construct a union passenger station as against the contention that Congress had occupied the field—in view of the broad sweep of the Act conferring authority upon the Interstate Commission to deal with the operation of interstate railroads—as it was found that Congress had not authorized the Commission to meet the public need in the particular matter in question. Atchison, T. & S. F. Ry. Co. v. Railroad Commission, supra, [283 U. S.] p. 391 [75 L. Ed. 1135, 51 S. Ct. 553] * * *. When the State is seeking to prevent the operation of unsafe and unseaworthy vessels in going to and from its ports, it is exercising a protective power akin to that which enables the State to exclude diseased persons, animals and plants. These are not proper subjects of commerce, and an unsafe and unseaworthy vessel is not a proper instrumentality of commerce. When the State is seeking to protect a vital interest, we have always been slow to find that the inaction of Congress has shorn the State of the power which it would otherwise possess."

In the present appeal the instrumentality of interstate commerce is not an unseaworthy boat, but it is a caboose, the use of which the state of Iowa has forbidden in order to safeguard trainmen and the public. Until Congress has spoken on that specific matter this court should not interfere with the action of the legislative department of government. As said in Atlantic Coast Line R. Co. v. State of Georgia, supra, 234 U. S. 280, 291, 34 S. Ct. 829, 831, 58 L. Ed. 1312, 1318: "In thus deciding, the court applied the settled principle that, in the absence of legislation by Congress, the States are not denied the exercise of their power to secure safety in the physical operation of railroad trains within their territory, even though such trains are used in interstate commerce. That has been the law since the beginning of railroad transportation. *It was not intended that pending Federal action the use of such agencies, which unless carefully guarded was fraught with danger to the community, should go unregulated, and that the States should be without authority to secure needed local protection.* [Italics supplied.] * * * If there is a conflict in

such local regulations, by which interstate commerce may be inconvenienced—if there appears to be need of standardization of safety appliances and of providing rules of operation which will govern the entire interstate road irrespective of state boundaries—there is a simple remedy; and it cannot be assumed that it will not be readily applied if there be real occasion for it. That remedy does not rest in a denial to the State, in the absence of conflicting Federal action, of its power to protect life and property within its borders, but it does lie in the exercise of the paramount authority of Congress in its control of interstate commerce to establish such regulations as in its judgment may be deemed appropriate and sufficient. Congress, when it pleases, may give the rule and make the standard to be observed on the interstate highway.''

In Parker v. Brown, supra, 317 U. S. 341, 362, 63 S. Ct. 307, 319, 87 L. Ed. 315, 332, the court, recognizing the complexities and the difficulties and the vital need of harmoniously operating forty-eight separate sovereignties within a single one, speaking through its lamented Mr. Chief Justice Stone, said:

''When Congress has not exerted its power under the Commerce Clause, and state regulation of matters of local concern is so ,related to interstate commerce that it also operates as a regulation of that commerce, the reconciliation of the power thus granted with that reserved to the state is to be attained by the accommodation of the competing demands of the state and national interests involved.''

There is no conflict here between state and national interests. Regulations of the type involved here have been accorded to the various states by the national supreme court, as it once said, in almost ''countless cases.''

Let us consider the ''competing demands'' of the parties to this proceeding. The state of Iowa, acting solely for the protection of a large body of its citizens engaged in a hazardous occupation, has forbidden the use of a caboose different from the cabooses uniformly used in Iowa and in the nation—a caboose which has not a single operating advantage over a caboose with a platform at each end; a caboose which

it must be said ·is more likely to cause injury to those using it than the statutory caboose, and less convenient to use. The company uses but a few of them in Iowa. Surely, in the interest of human lives and limbs, it would be but a slight inconvenience to transfer these few cabooses elsewhere on its vast system where their use may not violate a state statute.

Attention is called to other words of the departed Chief Justice, albeit in a dissenting opinion, joined in by Justices Byrnes, Murphy, and Frankfurter, in Cloverleaf Butter Co. v. Patterson, 315 U. S. 148, 176, 62 S. Ct. 491, 506, 86 L. Ed. 754, 774, words pregnant with good judgment and sound law, and particularly apropos to the contentions of the cross-appellants:

"Due regard for the maintenance of our dual system of government demands that the courts do not diminish state power *by extravagant inferences regarding what Congress might have intended if it had considered the matter, or by reference to their own conceptions of a policy which Congress has not expressed and is not plainly to be inferred from the legislation which it has enacted.* Considerations which lead us not to favor repeal of statutes by implication [citing cases] should be at least as persuasive when the question *is one of the nullification of state power by congressional legislation.*" (Italics supplied.)

The regulation of the statute is but a very slight hindrance, if any at all, to the free flow of interstate commerce. The use of a caboose is ordinarily confined to a single division of the road. While the expense of any police-power regulation is always a matter for consideration (Atchison, T. & S. F. Ry. Co. v. Railroad Commission of California, supra, 283 U. S. 380, 51 S. Ct. 553, 75 L. Ed. 1128, 1138, 1139, State of Washington ex rel. Oregon R. R. & N. Co. v. Fairchild, 224 U. S. 510, 529, 32 S. Ct. 535, 56 L. Ed. 863, 870), it is not ordinarily a valid objection where the regulation is for the protection of human life or limb. It is not a factor in this case.

In Terminal Railroad Assn. v. Brotherhood of Railroad

Trainmen, 318 U. S. 1, 8, 63 S. Ct. 420, 424, 87 L. Ed. 571–578, the court said:

"The record in the case does not afford a sure basis for calculating the costs to commerce resulting from the order against the costs to the safety and health of the workmen which it was intended to minimize, and there is evidence in the case that nearby railroads have seen fit in the absence of legal compulsion to provide cabooses in circumstances substantially similar to those upon which appellant relies to establish absence of state power."

The decision just quoted from involved an order of the Illinois Railroad Commission which required the appellant, Terminal Association, in the performance of its terminal and switching services and the interchange of cars to furnish cabooses for its crews of trainmen. The commission found that in the making up and breaking up of trains of cars for delivery and transfer one man in each crew was required to ride the rear car of the train when it was in motion. Many times, because of insufficient clearance on top or at the side, he was compelled to ride on the drawbar. The appellant contended that the commission had no power to enter any order relating to the movements of interstate commerce. The order had been upheld by the Supreme Court of Illinois (Brotherhood of Railroad Trainmen v. Terminal Railroad Assn., 379 Ill. 403, 41 N. E. 2d 481) and was affirmed by the United States Supreme Court. Mr. Justice Jackson, delivering the opinion, 318 U. S. 1, 6, 63 S. Ct. 420, 423, 87 L. Ed. 571, 577, said:

"State laws have long regulated a great variety of conditions in transportation and industry, such as sanitary facilities and conditions, safety devices and protections, purity of water supply, fire protection, and innumerable others. * * * But we would hardly be expected to hold that the price of the federal effort to protect the peace and continuity of commerce has been to strike down state sanitary codes, health regulations, factory inspections, and safety provisions for industry and transportation. * * * But it cannot be that the minimum requirements laid down by state authority are all

set aside. We hold that the enactment by Congress of the Railway Labor Act was not a preëmption of the field of regulating working conditions themselves and did not preclude the State of Illinois from making the order in question. We must decide the question of state power in this case in the absence of any Act of Congress that conflicts with the order or may be said to occupy its field. * * * In the absence of controlling federal legislation this Court has sustained a wide variety of state regulations of railroad trains moving in interstate commerce · * * * ."

In Missouri, K. & T. R. Co. v. Harris, supra, 234 U. S. 412, 418, 34 S. Ct. 790, 793, 58 L. Ed. 1377, 1382, L. R. A. 1915E, 942, already quoted from, Mr. Justice Pitney further stated, after discussing decisions referred to herein:

"These cases recognize the established rule that a state law enacted under any of the reserved powers—especially if under the police power—is not to be set aside as inconsistent with an act of Congress, unless there is actual repugnancy, or unless Congress has, at least, manifested a purpose to exercise its paramount authority over the subject. The rule rests upon fundamental grounds that should not be disregarded."

In Cummings v. Chicago, supra, 188 U. S. 410, 430, 23 S. Ct. 472, 477, 47 L. Ed. 525, 531, which sustained state and city authority to regulate structures in the navigable Chicago River, the court, through Mr. Justice Harlan, said:

"If it [Congress] had intended by the act of 1899 to assert the power to take under national control, for every purpose, and to the fullest possible extent, the erection of structures in the navigable waters of the United States that were wholly within the limits of the respective States, and to supersede entirely the authority which the States, in the absence of any action by Congress, have in such matters, such a radical departure from the previous policy of the Government would have been manifested by clear and explicit language. In the absence of such language it should not be assumed that any such departure was intended."

In Missouri Pac. R. Co. v. Norwood, supra, 283 U. S. 249, 256, 51 S. Ct. 458, 462, 75 L. Ed. 1010, 1017, complainant appealed from a decree dismissing its bill to restrain the attorney general et al. of Arkansas from enforcing state statutes regulating freight-train crews and switching crews. In upholding these statutes, Mr. Justice Butler, delivering the opinion of the court, said:

"In the absence of a clearly expressed purpose so to do Congress will not be held to have intended to prevent the exertion of the police power of the States for the regulation of the number of men to be employed in such crews. [Citing cases.] Plaintiff, while not claiming the Interstate Commerce Act in terms purports to cover that subject, insists that the Act does give the Commission jurisdiction over freight train and switching crews and so excludes the States from that field. It calls attention to a number of provisions of the Act and maintains that under them the Commission is empowered to regulate the 'practice' of carriers in respect of the 'supply of trains' to be provided by any carrier. But, assuming that the Act does so authorize regulation in respect of such practice and supply, it is clear that the delegation of power would not include the regulation of the number of brakemen or helpers. * * * We think it very clear that Congress has not prescribed or empowered the Commission to fix the number of men to be employed in train or switching crews."

Maurer v. Hamilton, supra, 309 U. S. 598, 614, 60 S. Ct. 726, 734, 84 L. Ed. 969, 974, 975, 980, 135 A. L. R. 1347, involved a Pennsylvania statute prohibiting the operation over its highways of any motor carrier carrying any other vehicle over the head of the operator of the vehicle. Appellant contended that the statute was superseded by the Federal Motor Carrier Act of August 9, 1935, and certain orders of the I. C. C. thereunder. The Supreme Court of Pennsylvania sustained the statute. The United States Supreme Court construed the state statute as one regulating the size and weight of motor vehicles, and since the federal act merely directed the I. C. C. to investigate and report on the need for federal regulation of sizes and weights of motor vehicles and combinations of motor vehicles,

this was a clear indication that it was intended to reserve from the regulatory power of the I. C. C. the regulation of "sizes and weights of motor vehicles." Mr. Chief Justice Stone, delivering the opinion, said:

"As a matter of statutory construction Congressional intention to displace local laws in the exercise of the commerce power is not, in general, to be inferred unless clearly indicated by those considerations which are persuasive of the statutory purpose. This is especially the case when public safety and health are concerned."

The chief reliance of the cross-appellants is Pennsylvania R. Co. v. Public Service Commission of Pennsylvania, supra, 250 U. S. 566, 40 S. Ct. 36, 63 L. Ed. 1142, and State ex inf. Haley v. Missouri Pac. R. Co., 323 Mo. 653, 19 S. W. 2d 879. The first case involved an order of the defendant requiring railroad carriers to equip a mail car, when used as the last car in an interstate train, with a platform, guard rail, and steps. The state courts upheld the order and the statute on which it was based. The United States Supreme Court reversed. Mail cars, including those used on the rear end of a train, were constructed in accordance with regulations of the postal department, a matter over which the state of Pennsylvania, of course, had no control. The rules and regulations of the Postal Department not only excluded a wide platform but provided an equipment for them when used as end cars. The construction and equipment of mail cars was wholly under the Postal Department of the United States, organized by Congress as provided by Article 1, section 8(7) of the Constitution of the United States, "To establish Post Offices and post Roads." The state of Pennsylvania had no more power to control the construction of a United States mail car than it had to order a portico on the Philadelphia post-office building. These facts were decisive of the case. The commission was not demanding that a caboose with a platform be attached to a fast mail train but it was demanding that the United States Government or the Postal Department equip the rear end of the rear mail car with a platform, guard rail, and steps. **This** was, of course, beyond its power or jurisdiction. A mail train

and a freight train and its crew are in services which differ considerably.

There is nothing in the order of March 13, 1911, issued by the Interstate Commerce Commission, which makes any mention of or has anything to do with United States mail cars. All safety appliances thereon are provided by the postal department, while all safety appliances under the Safety Appliance Acts must be put on the equipment by the railroad companies. There was no drawing of a mail car in the commission's order, so that there was even less justification for a "prescription" for a "standard" mail car than there was for the Rock Island's bob-tailed caboose. Whatever the distinguished justice who delivered the opinion said about the order's authorization "of prescriptions 'for. caboose cars without platforms'" was unadulterated obiter dictum, and was also without any fact basis under the Safety Appliance Acts or the commission's order. The decision has never been cited as sustaining the proposition that a caboose platform was a safety appliance under the Safety Appliance Acts, or that the commission's order of March 13, 1911, prescribed any particular type of caboose as standard, except in the decision of the Missouri Supreme Court, State ex inf. Haley v. Missouri P. R. Co., supra, 323 Mo. 653, 19 S. W. 2d 879.

The United States Supreme Court, in Terminal Railroad Assn. v. Brotherhood of Railroad Trainmen, supra, 318 U. S. 1, 4, 63 S. Ct. 420, 422, 87 L. Ed. 571, 576, expressed its conclusion as to the extent of the decision in Pennsylvania R. Co. v. Public Service Commission of Pennsylvania, supra, 250 U. S. 566, 40 S. Ct. 36, 63 L. Ed. 1142, as an authority, in the italicized part of the following quotation:

"Appellant claims that there had been Congressional occupation of the field by virtue of the Boiler Inspection Act, the Safety Appliance Act, and the Interstate Commerce Act. It is not contended, nor do we understand, that these statutes, by themselves and unimplemented by any action of the Interstate Commerce Commission, lay down any requirement that cabooses shall or shall not be used on any of the runs in question. Nor is it contended that the Interstate Commerce Commission itself has sought to make any such requirement. At

least in the absence of such action these Acts do not themselves preclude the state order, Atlantic Coast Line v. Georgia, 234 U. S. 280 [34 S. Ct. 29, 58 L. Ed. 1312]; cf. Welch Co. v. New Hampshire, 306 U. S. 79 [59 S. Ct. 38, 83 L. Ed. 500]; and it is unnecessary to consider on this occasion and without the participation of the Interstate Commerce Commission what may be the extent of its power under these Acts. *If it should in the exercise of granted power determine whether appellant must provide cabooses, the State would be powerless to gainsay it. This and no more is the effect of Pennsylvania R. Co. v. Public Service Commission, 250 U. S. 566 [40 S. Ct. 36, 63 L. Ed. 1142].*" (Italics supplied.)

What the Missouri Supreme Court said in State ex inf. Haley v. Missouri Pac. R. Co., supra, 323 Mo. 653, 19 S. W. 2d 879, was a decision and not dictum, but it was based wholly on Pennsylvania R. Co. v. Public Service Commission of Pennsylvania, supra, 250 U. S. 566, 40 S. Ct. 36, 63 L. Ed. 1142, and nothing further need be said of it. Neither authority has any weight or persuasive force in the determination of this appeal.

A case analogous to the proceeding before the court is Hill v. Minneapolis, St. P. & S. Ste. M. Ry. Co., 160 Minn. 484, 487, 200 N. W. 485, 486, in which action for personal injuries was brought against the defendant because of a defective step on its passenger car. Liability was based upon the company's alleged failure to comply with the Safety Appliance Acts in having a broken "step" on the passenger car. Recovery was denied because the only safety appliance "step" provided for in the acts was a "sill step," a strip of iron in the nature of a stirrup, and because a "step" on the platform of a passenger car was not a safety appliance under the acts or the commission's order of March 13, 1911. The court said:

"We are, therefore, brought to the conclusion that the Safety Appliance Act has no application to the present case."

In Illinois Cent. R. Co. v. Williams, 242 U. S. 462, 466, .37 S. Ct. 128, 129, 61 L. Ed. 437, 440, a personal-injury action based on noncompliance with the Safety Appliance Acts, the opinion, delivered by Mr. Justice Clarke, discusses sec-

tions 2 and 3 of the Act of April 14, 1910, and the commission's order of March 13, 1911. The opinion indicates that the reason why the commission made drawings of the various types of rolling stock was apparently to make very definite the exact location of each appliance. The opinion states:

"It is equally clear that the purpose of the third section is to require that the safety appliances *'provided for by section two of this Act'* shall ultimately conform to a standard to be prescribed by the Interstate Commerce Commission, that is, that they shall be standardized, shall be of uniform size and character, and *so far as ladders and hand holds are concerned, shall be placed as nearly as possible at a corresponding place on every car so that employees who work always in haste, and often in darkness and storm, may not be betrayed, to their injury or death, when they instinctively reach for the only protection which can avail them when confronted by such a crisis as often arises in their dangerous service.* It is for such emergencies that these safety appliances are provided,—for service in those instant decisions upon which the safety of life or limb of a man so often depends in this perilous employment,—*and therefore this law requires that ultimately the location of these ladders and hand holds shall be absolutely fixed so that the employee will know certainly that night or day he will find them in like place and of like size and usefulness on all cars, from whatever lines of railway or section of the country * * *."* (Italics supplied.)

The provision in section 7972 fully meets the test of the Federal Supreme Court herein stated. There is no clearly manifested intention in the Safety Appliance Acts to supersede the statute. There is no direct and positive repugnance or conflict. There is no difficulty in reconciling the statute and the acts, and both can stand side by side and function without the least interference.

V. As stated herein, it is the understanding of appellant that the cross-appellants concede that if the Safety Appliance Acts have not occupied the legislative field of the subject matter the challenged provision of section 7972 is valid and in force against them. Some decisions are here noted which

justify the concession. An ably written and often-quoted decision discussing the point is Smith v. Alabama, 124 U. S. 465, 482, 8 S. Ct. 564, 571, 31 L. Ed. 508, 513, delivered by Mr. Justice Matthews, sustaining an Alabama statute requiring all locomotive engineers to be examined and licensed as to their fitness to operate a locomotive, which states:

"The safety of the public in person and property demands the use of specific guards and precautions. The width of the gauge, the character of the grades, the mode of crossing streams by culverts and bridges, the kind of cuts and tunnels, the mode of crossing other highways, the placing of watchmen and signals at points of special danger, the rate of speed at stations and through villages, towns, and cities, are all matters naturally and peculiarly within the provisions of that law from the authority of which these modern highways of commerce derive their existence. The rules prescribed for their construction and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the limits of the local law. They are not per se regulations of commerce; it is only when they operate as such in the circumstances of their application, and conflict with the express or presumed will of Congress exerted on the same subject, that they can be required to give way to the supreme authority of the Constitution."

Such a regulation, while considered local to Alabama, might as properly apply generally to every state. Many of the decisions which follow affected interstate commerce far more directly and materially than does the statutory provision in this proceeding, but all of them sustained the power exercised by the states. Willson v. Black-bird Creek Marsh Co. (1824), 2 Pet. (U. S.) 245, 7 L. Ed. 412, opinion by Mr. Chief Justice Marshall, the damming of a navigable tidewater stream; Pound v. Turck, 95 U. S. 459, 24 L. Ed. 525, dam and log booms in navigable Chippewa River in Wisconsin; requiring pilotage in harbors: Cooley v. Board of Wardens of Port of Philadelphia, 12 How. (U. S.) 299, 13 L. Ed. 996; Wilson v. McNamee, 102 U. S. 572, 26 L. Ed. 234. Erection of a bridge, without a draw, in Philadelphia, over the navi-

gable Schuylkill River, preventing entry to masted vessels: Gilman v. Philadelphia, 3 Wall. (U. S.) 713, 18 L. Ed. 96. A bridge without a draw over American River, a navigable stream in California, with access to Pacific Ocean, preventing navigation: Cardwell v. American River Bridge Co., 113 U. S. 205, 5 S. Ct. 423, 28 L. Ed. 959. Locks in Illinois River: Huse v. Glover, 119 U. S. 543, 7 S. Ct. 313, 30 L. Ed. 487, 489. Consolidation of state railroads with competing lines, though interstate carriers, with far-reaching effect on interstate commerce: Pearsall v. Great Northern R. Co., 161 U. S. 646, 16 S. Ct. 705, 40 L. Ed. 838, 848; Louisville & N. R. Co. v. Kentucky, 161 U. S. 677, 16 S. Ct. 714, 40 L. Ed. 849, 859. Regulations of Chicago by authority of state of the opening and closing of draw bridges in the navigable Chicago River: Escanaba & Lake Michigan Transp. Co. v. Chicago, 107 U. S. 678, 2 S. Ct. 185, 27 L. Ed. 442. Regulations requiring fees and charges for use of harbors, docks, and wharves: Clyde Mallory Lines v. Alabama, 296 U. S. 261, 56 S. Ct. 194, 80 L. Ed. 215; County of Mobile v. Kimball, 102 U. S. 691, 26 L. Ed. 238; Parkersburg & O. R. Transp. Co. v. Parkersburg, 107 U. S. 691, 2 S. Ct. 732, 27 L. Ed. 584. Statutes limiting weight or width of motor trucks: South Carolina State Highway Dept. v. Barnwell Bros., supra, 303 U. S. 177, 58 S. Ct. 510, 82 L. Ed. 734; Morris v. Duby, supra, 274 U. S. 135, 47 S. Ct. 548, 71 L. Ed. 966; Sproles v. Binford, supra, 286 U. S. 374, 52 S. Ct. 581, 76 L. Ed. 1167; Buck v. Kuykendall, 267 U. S. 307, 45 S. Ct. 324, 69 L. Ed. 623, 38 A. L. R. 286. Examine trainmen as to color blindness and charge expense to employing railroad: Nashville, C. & St. L. Ry. Co. v. Alabama, 128 U. S. 96, 9 S. Ct. 28, 32 L. Ed. 352. Unlawful to operate a freight train on Sunday in intrastate or interstate commerce: Hennington v. Georgia, 163 U. S. 299, 16 S. Ct. 1086, 41 L. Ed. 166. Require passenger trains to heat cars other than by stoves and furnaces kept inside thereof, and require guard posts in prolongation of the line of bridges and trestles: New York, N. H. & H. R. Co. v. New York, 165 U. S. 628, 17 S. Ct. 418, 41 L. Ed. 853. Specify size of train crews in interstate commerce: Chicago, R. I. & P. R. Co. v. Arkansas,

219 U. S. 453, 31 S. Ct. 275, 55 L. Ed. 290, 293; St. Louis, I. M. & S. R. Co. v. Arkansas, 240 U. S. 518, 36 S. Ct. 443, 60 L. Ed. 776; Missouri Pac. R. Co. v. Norwood, supra, 283 U. S. 249, 51 S. Ct. 458, 75 L. Ed. 1010; Pittsburg, C., C. & St. L. R. Co. v. Indiana, 223 U. S. 713, 32 S. Ct. 520, 56 L. Ed. 626. Construct a union passenger station in Los Angeles in substantial compliance with plan of Railroad Commission: Atchison, T. & S. F. R. Co. v. Railroad Commission, 283 U. S. 380, 51 S. Ct. 553, 75 L. Ed. 1128. Provide facilities for patrons: See 75 L. Ed. 1138. Ordinance limiting speed of interstate trains in Kansas City: Erb v. Morasch, 177 U. S. 584, 20 S. Ct. 819, 44 L. Ed. 897. Eliminate grade crossings, construct bridges and viaducts: Erie R. Co. v. Board of Public Utility Commissioners, 254 U. S. 394, 41 S. Ct. 169, 65 L. Ed. 322; Lehigh Valley R. Co. v. Board of Public Utility Commissioners, supra, 278 U. S. 24, 35, 49 S. Ct. 69, 73 L. Ed. 161, 62 A. L. R. 805; Missouri, K. & T. R. Co. v. Oklahoma, 271 U. S. 303, 307, 46 S. Ct. 517, 70 L. Ed. 957, 960. Inspection and quarantine laws against importation of food, livestock, plants, etc., dangerous to health: Reid v. Colorado, supra, 187 U. S. 137, 23 S. Ct. 92, 47 L. Ed. 108; Patapsco Guano Co. v. Board of Agriculture, 171 U. S. 345, 18 S. Ct. 862, 43 L. Ed. 191; Savage v. Jones, supra, 225 U. S. 501, 32 S. Ct. 715, 56 L. Ed. 1182; Missouri, K. & T. R. Co. v. Haber, supra, 169 U. S. 613, 18 S. Ct. 488, 42 L. Ed. 878; Crossman v. Lurman, 192 U. S. 189, 24 S. Ct. 234, 48 L. Ed. 401; Asbell v. Kansas, 209 U. S. 251, 28 S. Ct. 485, 52 L. Ed. 778, 14 Ann. Cas. 1101. Statute of Iowa prohibiting carrier from limiting by contract, etc., its liability for negligence in transporting persons or property: Chicago, M. & St. P. R. Co. v. Solan, 169 U. S. 133, 18 S. Ct. 289, 42 L. Ed. 688, 692; Pennsylvania R. Co. v. Hughes, 191 U. S. 477, 24 S. Ct. 132, 48 L. Ed. 268. Statute of Florida forbidding sale or delivery for shipment in interstate commerce of citrus fruit which was unripe or otherwise unfit for food: Sligh v. Kirkwood, 237 U. S. 52, 35 S. Ct. 501, 59 L. Ed. 835, 837, 838. Charging license fee for operation of automobile by nonresident in Maryland: Hendrick v. Maryland, 235 U. S. 610, 35

S. Ct. 140, 59 L. Ed. 385, 391. Ordinance requiring suitable rail or barrier on rear platform of interstate streetcar: South Covington & Cincinnati Street Ry. Co. v. Covington, 235 U. S. 357, 35 S. Ct. 158, 59 L. Ed. 350, 354, L. R. A. 1915F, 792. A South Carolina statute requiring carriers to adjust and pay damages for intrastate shipments in forty days and interstate losses in ninety days: Atlantic Coast Line R. Co. v. Mazursky, 216 U. S. 122, 30 S. Ct. 378, 54 L. Ed. 411. A similar holding: Missouri, K. & T. R. Co. v. Harris, supra, 234 U. S. 412, 34 S. Ct. 790, 58 L. Ed. 1377, L. R. A. 1915E, 942. Reasonable regulations as to signals, control, and speed of interstate trains as they approach dangerous crossings, cuts, tunnels, bridges, etc.: Southern R. Co. v. King, 217 U. S. 524, 30 S. Ct. 594, 54 L. Ed. 868, 870; Crutcher v. Kentucky, 141 U. S. 47, 11 S. Ct. 851, 35 L. Ed. 649. Order of Railroad Commission requiring terminal railroad operating yards for interchange of interstate cars, to furnish cabooses, held no violation of Federal Boiler Inspection Act, or Safety Appliance Acts, or Interstate Commerce Act: Terminal Railroad Assn. v. Brotherhood of Railroad Trainmen, supra, 318 U. S. 1, 63 S. Ct. 420, 87 L. Ed. 571. Requiring foreign corporations doing business in state to obtain and pay license therefor and to give specified information as to officers, stock issue, etc.: Union Brokerage Co. v. Jensen, 322 U. S. 202, 64 S. Ct. 967, 88 L. Ed. 1227, 1232, 152 A. L. R. 1072. Statute of Georgia fixing maximum charges for handling and selling leaf tobacco for interstate commerce: Townsend v. Yeomans, supra, 301 U. S. 441, 57 S. Ct. 842, 81 L. Ed. 1210, 1220, 1223. Licensing agents who " 'sells or offers [to sell] or negotiate for' transportation over highways": State of California v. Thompson, supra, 313 U. S. 109, 61 S. Ct. 930, 85 L. Ed. 1219, 1223. Requiring interstate trains to stop at county seats: Gladson v. Minnesota, 166 U. S. 427, 17 S. Ct. 627, 41 L. Ed. 1064.

VI. Appellants introduced in evidence a letter on the stationery of the Interstate Commerce Commission, with the following letterhead:

"INTERSTATE COMMERCE COMMISSION
Bureau of Safety
Washington"

It bears date of August 19, 1944, and was addressed to "Mr. Robert G. Janss, Assistant Commerce Counsel, State of Iowa, Des Moines, Iowa," and is as follows:

"Dear Mr. Janss: We have received your letter of August 16, referring to your letter of August 3 and our reply of August 7, with further reference to certain caboose cars equipped with platform on one end only and used on the lines of the Chicago, Rock Island and Pacific Railway Company in Iowa.

You are correct in your understanding that under the safety appliance acts the Commission exercises supervision only in respect to the application of safety appliances, and not in respect to features of construction of the car itself *as platforms or blind ends.* [Italics supplied.]
[Signed]    S. N. Mills, Director."

Concerning this letter, the brief and argument of the cross-appellants states:

"The District Judge did not directly rule on the objections [to the letter], but did state that he would give no consideration whatever to the letter, and we think it is obvious that the District Judge was right."

The letter was admissible. On its face it appears to be a communication from an officer of the Interstate Commerce Commission in a department thereof that apparently would have charge of safety appliances on railroad rolling stock. The official identity of the writer of the letter is not challenged in any way. It was properly in evidence for what it was worth, and it should not have been disregarded by the trial court.

It has been held by the United States Supreme Court that contemporaneous construction of a statute by those charged with the duty of executing it ought not be overruled without cogent reasons. Brown v. United States, 113 U. S. 568, 5 S. Ct. 648, 28 L. Ed. 1079.

In State v. Robbins, 235 Iowa 602, 608, 609, 15 N. W. 2d 877, 880, this court said:

"While these departmental constructions are not conclusive upon the courts, they are entitled to weight and consideration, and the practical interpretation placed upon the statutes by officers whose duty it is to administer and enforce them ought not be lightly discarded ·by the courts."

Numerous authorities are cited in support of the statement. See, also, Heiliger v. City of Sheldon, 236 Iowa 146, 164, 18 N. W. 2d 182, 191, and Mintz v. Baldwin, supra, 289 U. S. 346, 53 S. Ct. 611, 77 L. Ed. 1245, 1249, which holds that the practical interpretation of a federal statute by the department entrusted with its administration is entitled to much weight in determining its proper construction.

It is our conclusion that the decree of the district court should be reversed on appellants' appeal, and affirmed on cross-appellants' appeal.—Reversed on defendants' appeal; affirmed on plaintiffs'· cross-appeal.

GARFIELD, C. J., and OLIVER, MULRONEY, and WENNERSTRUM, JJ., concur.

MANTZ, MILLER, SMITH, and HALE, JJ., dissent.

MANTZ, J. (dissenting)—I find myself unable to join in the majority opinion. In my judgment it overlooks the real litigated issue herein, and that is whether the United States Safety Appliance Acts so invaded the field of the regulation of the· construction and maintenance of railway cabooses as to invalidate any state regulations upon the same subject by the states.

The parties by pleading and brief and argument have set forth the matters in issue and I think that this court should confine its decision to such issue.

In this dissent I shall endeavor to set forth such issues. I have made brief citations of cases which in my opinion clearly control. Many others ·might be cited but as they simply bear out and support the ones cited I will not set them out. I think that the majority opinion will have the effect of adding confusion to a situation which calls for clarification.

This controversy grows out of an order made on December 20, 1944, by the Iowa State Commerce Commission (hereinafter referred to as the commission), directed to Joseph B.

Fleming and Aaron Colnon, Trustees of the Estate of the Chicago, Rock Island, and Pacific Railway Company (hereinafter referred to as the railroad), requiring the railroad to desist from the use of caboose cars not having an outside platform across each end thereof, on its lines in Iowa. This order was issued upon a complaint filed with the commission on November 30, 1940, by a branch of the railroad brotherhoods, wherein it was charged that the railroad was operating, over some of its lines in Iowa, one-platform cabooses, in violation of section 7972, Code of Iowa, 1939 (section 477.27, Code, 1946), and asking the commission to enforce the provisions of' such section.

On December 20, 1944, following a hearing, said commission ordered that the railroad discontinue the use of one-platform cabooses then in use on lines of its railroad in Iowa.

On December 31, 1944, the railroad, designating itself as plaintiff, appealed to the district court of Polk County, Iowa, from the ruling and order of the commission pursuant to the provisions of section 7887, Code of Iowa, 1939 (section 474.28, Code, 1946), and petitioned that said order be vacated and set aside, setting forth as grounds thereof that at the hearing before the commission its order requiring the discontinuance of one-platform cabooses on its lines in Iowa was in excess of its power and authority and that such question was wholly cognizable either by the Congress of the United States or the Interstate Commerce Commission created by an act of Congress, and that as said Interstate Commerce Commission had specifically taken control of the subject matter of cabooses, platforms, and equipment, by virtue of its delegated authority to regulate the matter of safety appliances on cars and trains engaged in interstate commerce, and by reason of the assumptive jurisdiction of said subject matter the State of Iowa, through its commission, had no right or authority to act in such field.

Following a hearing upon such petition, a decree was entered in said court on July 11, 1945, wherein the ruling and order of the commission of December 20, 1944, was set aside and held to be of no force and effect with regard to the use of one-platform cabooses used in the furtherance of

interstate commerce in Iowa and, further that the order was valid, lawful, and enforceable in respect to purely intrastate commerce or transportation in Iowa. Both parties have appealed.

On the appeal from the decree of the district court adverse to the commission, this dissent will refer to the commission as the appellant and to the railroad as the appellee. On the appeal of the railroad from that part of the decree of the district court sustaining the commission the railroad will be referred to as the cross-appellant. I will first consider the appeal by the commission.

I. The facts in the case are not in dispute. They appear from the stipulation of the parties and from the uncontroverted pleadings. Some question is raised as to the competency of evidence offered and particularly to a letter introduced by appellant and purporting to have emanated from the Bureau of Safety of the Interstate Commerce Commission and relating to safety appliances upon cabooses.

The appellant commission based its right to issue the order appealed from by reason of the provisions of section 7972, Code of Iowa, 1939 (section 477.27, Code of 1946), which section, so far as is material herein, provides as follows:

"It shall be unlawful, except as otherwise provided in this chapter, for any such common carrier by railroad to use on its lines any caboose car or other car used for like purposes, unless such caboose or other car shall be at least twenty-four feet in length, exclusive of the platform, and equipped with two four-wheel trucks, and shall be provided with a door in each end thereof and an outside platform across each end of said car; each platform shall not be less than eighteen inches in width and shall be equipped with proper guard rails, and with grab irons, hand brakes, and steps for the safety of persons getting on and off said car; said steps shall be equipped with a suitable rod, board, or other guard at each end and at the back thereof, properly designed to prevent slipping from said step."

Under the stipulated facts, the appellee railroad on November 30, 1940, and up to the time of the hearing, had in

use on some of its lines in Iowa, cabooses with but one platform thereon. The appellee justified such use by reason of the National Safety Appliance Act of the Congress of the United States, as implemented by the orders of the Interstate Commerce Commission made pursuant to the authority delegated to it by the United States Congress, claiming that thereby the United States Government had occupied the field of regulation respecting the standards of safety equipment on caboose cars and that the state of Iowa had no right or authority to attempt to regulate said matters.

The trial court, in referring to the interstate business of the appellee, held that the decisions of the Supreme Court of the United States affirmatively showed that the subject of caboose platforms had been taken over exclusively by the Interstate Commerce Commission under authority of an Act of Congress, and, such being the case, the states cannot add to or substract anything therefrom.

In essence appellant's claim for reversal is based upon two propositions:

(1) That the trial court erred in holding that a platform on a caboose was a safety appliance or equipment and was not a feature of construction; and further erred

(2) In holding that the Interstate Commerce Commission by its regulations had invaded the field of caboose construction with regard to platforms and that consequently the state of Iowa had no right to legislate in that field.

As these two propositions are more or less related and are interdependent we think they may be considered together.

Counsel for appellant in brief states:

"It is admitted by the parties that in the event that the National Safety Appliance Acts have invaded the field and are applicable to the issues involved in this case, then Section 7972, Code, 1939, is invalid."

Further in brief counsel for appellant commission makes a rather significant statement:

"A caboose platform is not a safety appliance and the Iowa statute should be upheld."

That the Interstate Commerce Commission has entered the field in regard to cabooses and safety appliances thereon appears from the regulations set forth in an exhibit, "United States Safety Appliances," Fourteenth Edition, 1935, and issued by the Mechanical Division of the Operation and Maintenance Department of the Association of American Railroads.

An examination of this exhibit shows detailed regulations, and drawings regarding cabooses. It deals with cabooses with platforms and those without platforms. These regulations go into detail as to doors, hand brakes, running boards, ladders, steps, roof handholds, cupola handholds, end-platform handholds, and caboose-platform steps. Reference is made to the location of a brake shaft on caboose cars with platforms. Necessarily there is some difference in regard to the appliances required on caboose cars without platforms.

It can readily be seen, following a study of such regulations and the appliance requirements and the details of construction, the fastenings and location, that they were formulated to safeguard employees engaged in the operation of the cars.

The order of the Interstate Commerce Commission was made in 1911 and was pursuant to the Safety Appliance Acts of 1893 and 1910, and therein was fixed the standard of construction of caboose cars. The Act of Congress clearly and expressly delegated to the Interstate Commerce Commission the power and authority to provide standards in the construction of cabooses. The requirements promulgated pursuant to such clearly and distinctly relate to safety and safety appliances.

In argument counsel for appellant commission asserts that the authority delegated to or to be assumed by the Interstate Commerce Commission under the National Safety Appliance Acts relates to the number of, dimensions, and location of safety appliances that are used on certain cars, including cabooses.

In referring to section 7972 appellant states:

"The reason for this enactment was to provide for the safety of passengers and trainmen."

We quote a further statement from the brief of appellant:

"When these cabooses are placed at the end of the train with the platform next to the car ahead an immediate hazard arises for both passengers and trainmen. The passenger may walk out of the rear door and fall to the rails, while the brakeman, conductor and switchman would be subject to the hazard of all of them trying to swing on a platform which was not placed at the end of the car and would be handicapped in their efforts with the liability of falling and other accidents. So the purpose of the statute was reasonable. The National Safety Appliance Acts have the same purpose but only so far as safety appliances, their number and location on the caboose itself is concerned."

While section 7972 is not by express terms designated as a safety measure, yet the clear and unmistakable language thereof can have no other purpose. It refers to brakes, trucks, platforms, the width thereof and the guard rails thereon, grab irons, steps for safety of persons getting on and off the caboose, which steps "shall be equipped with a suitable rod, board, or other guard at each end and at the back thereof, properly designed to prevent slipping from said step."

The order of the appellant commission seems to be based upon the premise that the United States Safety Appliance Acts and the orders of the Interstate Commerce Commission do not *exclusively* occupy the field to the extent that the provisions of sections 7972 and 7973, Code of Iowa, 1939, have been superseded or nullified. (Italics supplied.)

It is readily apparent following a comparison of regulations of the Interstate Commerce Commission and those of the state as set forth in section 7972, Code of Iowa, 1939, that to a very considerable extent they cover the same field. Such being the case, those promulgated by the Interstate Commerce Commission must prevail.

In addition to the statute, section 7972, appellant, in support of the position taken, relies upon a letter (Exhibit 6) dated August 19, 1944, and signed by S. N. Mills, under the designation of Director of the Bureau of Safety of the Interstate Commerce Commission, and directed to Robert G. Janss,

Assistant Commerce Counsel of Iowa. Said letter is as follows:

"You are correct in your understanding that under the safety appliance acts the Commission exercises supervision only in respect to the application of safety appliances, and not in respect to features of construction of the car itself as platforms or blind ends."

When this letter was offered by appellant it was objected to by appellee on various grounds, among which were that the identity and authority of the purported writer were not established by proof; that it was self-serving; that it did not state facts but only legal conclusions. While the court did not rule upon the objections it did state that it gave it no consideration.

Taking into consideration the subject matter involved, we think that the letter was not admissible and was not evidence of any order or directive of the Interstate Commerce Commission and the objections thereto should be sustained.

It seems to me that both the Federal Safety Appliance Acts and that of the state of Iowa as set forth in section 7972 relate to safety appliances used on or about cabooses. Appellant argues throughout that a platform on a caboose is merely a feature of construction. It seems to me that the designation of brakes, steps, handholds, etc., are features of construction and at the same time are safety appliances. It seems unreasonable and illogical to say that a platform at one or both ends of a caboose is simply a feature of construction and is not a safety appliance. From a platform a door leads into the caboose. Standing on a platform one would be in a position of safety. Platforms have steps, guards, rails, and handholds. It seems to me that many things about a caboose may be features of construction and at the same time appliances of safety.

It will thus be seen that the specific claim of appellant is that as the regulations of the Interstate Commerce Commission regarding safety appliances upon cabooses do not deal with one-platform cabooses that field was left open for state

legislation, and that section 7972, Code of Iowa, 1939, did not conflict with the regulations of the Interstate Commerce Commission.

It would seem difficult to harmonize this claim with the further claim of appellant that the platform of a one-platform caboose is simply a feature of construction, all in the face of the regulations of the Interstate Commerce Commission wherein two-platform cabooses are dealt with.

It would seem that the regulations of the Interstate Commerce Commission viewed platforms as safety measures. Such regulations located the brake shaft "on caboose cars with platforms." Such end platforms required four handholds; steps leading to caboose platforms are provided for. Without such platform there would be no place to set the brake shaft or fasten the handholds or set the steps.

The same regulations clearly contemplate end doors to cabooses where there are end platforms and side doors in the absence of end platforms. This is shown by the requirements of the handholds which are used in boarding and alighting from the caboose.

Heretofore I have set out the concession of appellant, which, in effect, is that if the National Safety Act has invaded the field and its regulations are applicable to the issues, then section 7972, Code of Iowa, 1939, is invalid. It can hardly be denied that the act has invaded the field of cabooses in that it made certain requirements concerning the same, all being in line with the element of safety of employees. Appellant admits that the distinction which is sought to be drawn in this case is a fine one.

In short, appellant's claim, in essence, is that a platform on a caboose is not a safety appliance within the purview of the Safety Appliance Act. That act does not define the term. However, the title or preamble to the act may throw some light upon that matter. We quote:

"An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving wheel brakes, *and for* other purposes." (Italics supplied.)

The earliest Safety Appliance Act was in 1893 and affected cars to be used in interstate commerce. In 1903 it was amended and was extended to all cars used upon any railroad which is a highway of interstate commerce. Southern R. Co. v. United States, 222 U. S. 20, 32 S. Ct. 2, 56 L. Ed. 72. These acts impose an absolute duty upon an employer and prescribe penal sanctions for breach. Tipton v. Atchison, T. & S. F. Ry. Co., 298 U. S. 141, 56 S. Ct. 715, 80 L. Ed. 1091, 104 A. L. R. 831. The Federal Safety Appliance Act is remedial to protect employees and the public from injuries because of defective appliances and to safeguard interstate commerce itself from obstructions and injury due to defective appliances upon locomotives and cars used on the highways of interstate commerce, although their individual use may be intrastate. See, also, Swinson v. Chicago, St. P., M. & O. R. Co., 294 U. S. 529, 55 S. Ct. 517, 79 L. Ed. 1041, 96 A. L. R. 1136.

It was pursuant to this act and its subsequent amendments that the present regulations of the Interstate Commerce Commission were promulgated. Safety of employees and travelers was the fundamental purpose of the act. The various courts of the country, including the Supreme Court of the United States, have so regarded it in construing and applying its provisions. "Safe" or "safety" within a safe-place statute, means such freedom from danger to life, health, safety, or welfare of employees as nature and place of employment will reasonably permit. Baker v. Janesville Traction Co., 204 Wis. 452, 234 N. W. 912; Kelly v. Kneeland-McLurg Lumber Co., 161 Wis. 158, 152 N. W. 858; Olson v. Whitney Bros. Co., 160 Wis. 606, 150 N. W. 959; Hollister v. Kingsbury, 129 Cal. App. 420, 18 P. 2d 1006; Maryland Casualty Co. v. Thomas Furnace Co., 185 Wis. 98, 201 N. W. 263. The term when used in connection with the operation of railroad transportation quite uniformly has reference to the perils and hazards incident to such operation. Webster defines "safety" as the "condition or state of being safe; freedom from danger or hazard; exemption from hurt, injury, or loss."

"Safety appliances" include all things which will secure safety and this refers to all physical conditions existing. Cook v. Big Muddy-Carterville Mining Co., 249 Ill. 41, 94 N. E.

90. A platform on top of an ordinary freight boxcar was held to be a safe place for a car repairer, under the Federal Safety Appliance Acts. Borde v. New Orleans & G. N. R. Co., La. App., 140 So. 810. "Safety gates" at railroad crossings are something more than warning signals. They are physical hindrances in the way of those seeking to cross railroad tracks. West Jersey & S. S. R. Co. v. City of Bridgeton, 64 N. J. Law 189, 44 A. 848. A bridge over railroad tracks, when necessary to make a crossing safe for public use, is a "safety device." State ex rel. City of Minneapolis v. St. Paul, M. & M. Ry. Co., 98 Minn. 380, 108 N. W. 261, 28 L. R. A., N. S., 298, 120 Am. St. Rep. 581, 8 Ann. Cas. 1047. Anything which is provided by the employer in the operation of a machine, the use of which would reduce hazard to the employee from the machine operation, is a safety appliance. Herman v. Aetna Casualty & Surety Co., 71 Ga. App. 464, 31 S. E. 2d 100.

I am unable to understand why a platform on a caboose is not a safety appliance even though it may not be specifically so designated by the regulations of the Interstate Commerce Commission. There always will be certain hazards and risks incident to boarding or alighting from railroad cars. Quite frequently employees board a caboose while the train is in motion, and this is true in alighting therefrom. A platform furnishes a secure place upon which to stand. It has side steps, rails, and handholds.

While it may be a feature of construction the same as doors, floors, and windows of a caboose, yet at the same time it is a safety appliance when used in connection with the operation. To hold otherwise would be to disregard something which is a matter of almost universal understanding on the part of those who make use of it.

II. The various Safety Appliance Acts were largely brought about to protect employees and travelers from perils and hazards incident to travel and operation of railroads and were enacted in the exercise of the police power of the state. The primary purpose of police power is to protect the public welfare and permit the enactment of laws essential to the public safety, health, and morals. To justify the exercise of such power it must appear that the interests of the public so re-

quire and that the means are reasonably necessary for the accomplishment of such purpose. Lawton v. Steele, 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385; State ex rel. Mitchell v. Thompson's School of Beauty Culture, 226 Iowa 556, 285 N. W. 133.

"The .police power is very broad, and so elastic that no comprehensive definition has ever been attempted. Of necessity, this must be so, for it must ever respond to such social conditions 'as an advancing civilization of a highly complex character requires.' Anything which legitimately tends to promote public morals, health, or security is within its scope * * *." State v. Armour Packing Co., 124 Iowa 323, 330, 100 N. W. 59, 61, 2 Ann. Cas. 448.

As to police powers generally, see 11 Am. Jur. 966. On page 989 of said volume 11, section 257, it is stated that the exercise of the police power by a state is beyond interference by the Federal Government except by virtue of some authority derived from the Constitution of the United States. All that the Federal Government can do ordinarily is to see that the states do not, in attempting to exercise the police power, invade the sphere of national sovereignty, obstruct or impede the exercise of any authority which the Constitution has vested in the National Government, or deprive a citizen of rights guaranteed to him by the Federal Constitution.

The various United States Safety Appliance Acts are essentially police regulations, enacted for the purpose of protecting and safeguarding the employees of railroads and the traveling public from injury.

It seems quite evident that section 7972, Code of Iowa, 1939, is likewise a safety measure and was enacted pursuant to the police power of the state of Iowa and for the same purpose as the United States Safety Appliance Act.

In discussing the matter of police power, the court, in Jacobson v. Massachusetts, 197 U. S. 11, 25, 25 S. Ct. 358, 361, 49 L. Ed. 643, 3 Ann. Cas. 765, said:

"According to settled principles the police power of a State must be held to embrace, at least, such reasonable regu-

lations established directly by legislative enactment as will protect the public health and the public safety.''

This court has frequently had for consideration the police powers of a sovereignty. See Loftus v. Department of Agriculture, 211 Iowa 566, 232 N. W. 412 [appeal dismissed 283 U. S. 809, 51 S. Ct. 647, 75 L. Ed. 1427]; State v. Erle, 210 Iowa 974, 232 N. W. 279, 72 A. L. R. 137.

I will follow with a citation and brief discussion of various decisions which I think sustain the holding of the trial court wherein the order was made vacating the order of appellant commission.

In the case of Southern R. Co. v. Railroad Commission of Indiana, 236 U. S. 439, 446, 35 S. Ct. 304, 305, 59 L. Ed. 661, there was involved a statute of the state of Indiana which required handholds on sides *or* ends of cars, while the federal regulation required handholds be placed both on the sides and ends of cars. The case holds that in the field of interstate commerce the jurisdiction of the Federal Government is supreme and that where it or its instrumentalities created under its authority have entered that field it renders state legislation in that field invalid. The case further holds that an intrastate railroad comes within the purview of the Safety Appliance Act.

I think the holding in that case supports and sustains the holding of the trial court of Polk county. I quote the following excerpt from the decision in the Southern case as follows:

''Such is the case here where Congress, in the exercise of its power to regulate interstate commerce, has legislated as to the appliances with which certain instrumentalities of that commerce must be furnished in order to secure the safety of employés. Until Congress entered that field the States could legislate as to equipment in such manner as to incidentally affect without burdening interstate commerce. But Congress could pass the Safety Appliance Act only because of the fact that the equipment of cars moving on interstate roads was a regulation of interstate commerce. Under the Constitution the nature of that power is such that when exercised it is exclusive,

and ipso facto, supersedes existing state legislation on the same subject. Congress of course could have 'circumscribed its regulations' so as to occupy a limited field. Savage v. Jones, 225 U. S. 501, 533 [56 L. Ed. 1182, 1194, 32 Sup. Ct. Rep. 715]. Atlantic Line v. Georgia, 234 U. S. 280, 293 [58 L. Ed. 1312, 1318, 34 S. Ct. 829]. But so far as it did legislate, the exclusive effect of the Safety Appliance Act did not relate merely to details of the statute and the penalties it imposed, but extended to the whole subject of equipping cars with appliances intended for the protection of employés. The States thereafter could not legislate so as to require greater or less or different equipment; nor could they punish by imposing greater or less or different penalties. For, as said in Prigg v. Commonwealth of Pennsylvania, 16 Pet. 539, 617 [10 L. Ed. 1060]: 'If Congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, it cannot be that the state legislatures have a right to interfere; and, as it were, by way of complement to the legislation of Congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose. In such a case, the legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any farther legislation to act upon the subject-matter. Its silence as to what it does not do, is as expressive of what its intention is as the direct·provisions made by it . . . the will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed.' "

In the case of Erie Railroad v. People of the State of New York, 233 U. S. 671, 34 S. Ct. 756, 58 L. Ed. 1149, 52 L. R. A., N. S., 266, there was involved the question as to the right of the state to regulate the working hours of railroad employees. The state statute penalized a carrier which worked its employees more than eight hours per day; the federal statute penalized the carrier if the employee worked more than nine hours per day. The court (United States) held that while there was a conflict between the state and federal statutes the latter controlled and that those of the state were invalid.

870

It seems to me that the identical question involved in the present case has been ruled upon in the case of State ex inf. Haley v. Missouri Pac. R. Co., 323 Mo. 653, 19 S. W. 2d 879, 882. In 1924 the legislature of that state passed a law requiring every caboose car operated upon any Missouri railroad to have outside platforms across each end of said car not less than thirty inches wide. The railroad was prosecuted, convicted, and fined for violation of such statute. The railroad contended that the state law was inapplicable because the field of regulation had been taken over by the United States Safety Appliance Act and the regulations of the Interstate Commerce Commission. Upon appeal the Supreme Court of Missouri sustained the railroad and reversed the judgment. In so doing, that court said:

"The statute in issue here prohibits 'the use of *any caboose cars in any commerce, traffic, transportation or intercourse* between two or more points or places wholly within this State,' or on '*any railroad or railway in whole or in part within this State,*' unless said caboose cars shall be constructed and equipped as therein prescribed; and said specifications include, among other things, *end platforms equipped with guardrails, grab irons, and steps with riser and skirt boards at the sides and back thereof.* The Interstate Commerce Commission's order of March 13, 1911, made in pursuance of the Safety Appliance Acts of 1893 and 1910, fixed the standard of construction and equipment of 'Caboose Cars With Platforms' and of 'Caboose Cars Without Platforms.' And it has been held that the Safety Appliance Acts of Congress are 'intended to embrace all locomotives, cars and similar vehicles *used on any railroad which is a highway of interstate commerce.*' (Our italics.) [Southern Ry. Co. v. United States, 222 U. S. 1. c. 26]. Therefore, the defendant railroad company, being engaged in interstate commerce, cannot be held to account for its failure to comply with legislation of this State relating to the construction and equipment of caboose cars. The statute in question does not discriminate between caboose cars used by railroad companies engaged exclusively in intrastate commerce and caboose cars used by railroad companies engaged in both intrastate and

interstate commerce. In undertaking to provide how caboose cars used by railroad companies engaged in interstate commerce shall be constructed and equipped, the State of Missouri has invaded a field of regulation over which Congress has exercised its exclusive control; and, in undertaking to prohibit the use of *caboose cars without platforms* by railroad companies engaged in interstate commerce, the State of Missouri enacted a statute which is in direct conflict with the Safety Appliance Acts of Congress and the regulations of the Interstate Commerce Commission made in pursuance thereof, the use of caboose cars without platforms being expressly authorized thereby. As we have already indicated, this statute is wholly ineffectual as to the construction and equipment of caboose cars used by railroad companies engaged in interstate commerce, because Congress has taken over that field of regulation." (Italics supplied.)

It seems to us that the holding of the Missouri court has direct application to the issues involved in the instant case.

In the case of Pennsylvania Railroad Co. v. Public Service Commission of Pennsylvania, 250 U. S. 566, 569, 40 S. Ct. 36, 37, 63 L. Ed. 1142, there was involved a Pennsylvania statute which required the last car of each train to be equipped with a platform thirty inches in width, with guard rails and steps. The railroad ran trains consisting solely of mail and express cars which did not comply with this statute. Upon appeal the case was reversed. From the opinion, written by Justice Holmes, I quote:

"But when the United States has exercised its exclusive powers over interstate commerce so far as to take possession of the field, the States no more can supplement its requirements than they can annul them. Southern Ry. Co. v. Railroad Commission of Indiana, 236 U. S. 439, 446 [59 L. Ed. 661, 665]. Charleston & Western Carolina Ry. Co. v. Varnville Furniture Co., 237 U. S. 597, 604 [59 L. Ed. 1137, 1140]. New York Central R. R. Co. v. Winfield, 244 U. S. 147 [61 L. Ed. 1045]. In the present instance the rules for the construction of mail cars, admitted to be valid, not only exclude the wide platform but provide an equipment for them when

used as end cars. The Safety Appliance Act with its careful requirements for the safety of the men was followed by most elaborate regulations issued by the Interstate Commerce Commission which include three large pages of prescriptions for 'Caboose Cars without Platforms.' Caboose cars constantly are used as end cars and these pages like the Post Office order as to mail cars recognize the lawfulness of an end car such as the Pennsylvania statute forbids.

"The question whether Congress and its commissions acting under it have so far exercised the exclusive jurisdiction that belongs to it as to exclude the State, must be answered by a judgment upon the particular case. The subject-matter in this instance is peculiarly one that calls for uniform law and in our opinion regulation by the paramount authority has gone so far that the statute of Pennsylvania cannot impose the additional obligation in issue here. The Interstate Commerce Commission is continually on the alert, and if the Pennsylvania law represents a real necessity, no doubt will take or recommend steps to meet the need."

It seems to me that the question involved was passed upon by our highest court in Napier v. Atlantic Coastline R. Co. and Chicago & Northwestern R. R. Co. v. Railroad Commission, 272 U. S. 605, 612, 47 S. Ct. 207, 210, 71 L. Ed. 432, in which it passed upon state legislation in Georgia and an order of the Wisconsin Railroad Commission dealing with certain equipment upon locomotives operated in such respective states. The ultimate question was, Since Congress had occupied the field of regulation, were the state statutes inoperative? In ruling against the contentions of the two states, the court, speaking through Justice Brandeis, said:

"The federal and the state statutes are directed to the same subject—the equipment of locomotives. They operate upon the same object. It is suggested that the power delegated to the Commission has been exerted only in respect to minor changes or additions. But this, if true, is not of legal significance. It is also urged that, even if the Commission has power to prescribe an automatic fire-box door and a cab curtain, it has not done so; and that it has made no other re-

quirement inconsistent with the state legislation. This, also, if true, is without legal significance. The fact that *the Commission has not seen fit to exercise its authority to the full extent conferred, has no bearing upon the construction of the act delegating the power.* We hold that state legislation is precluded, because the Boiler Inspection Act, as we construe it, was intended to occupy the field. The broad scope of the authority conferred upon the Commission leads to that conclusion. Because the standard set by the Commission must prevail, requirements by the States are precluded, however commendable or however different their purpose. Compare Louisville & Nashville R. Co. v. State, 16 Ala. App. 199 [76 So. 505]; Whish v. Public Service Commission, 205 App. Div. 756 [200 N. Y. Supp. 282], 240 N. Y. 677 [148 N. E. 755]; Staten Island Rapid Transit Co. v. Public Service Commission, 16 Fed. (2d) 313. [Italics supplied.]

."If the protection now afforded by the Commission's rules is deemed inadequate, application for relief must be made to it. The Commission's power is ample. Obviously, the rules to be prescribed for this purpose need not be uniform throughout the United States; or at all seasons; or for all classes of service."

While the appellant commission has cited various cases to sustain its claims, yet it seems to base its main reliance upon the case of the Terminal Railroad Assn. v. Brotherhood of Railroad Trainmen, 318 U. S. 1, 4, 63 S. Ct. 420, 422, 87 L. Ed. 571. I think that case is readily distinguishable from the present case. In that case the Illinois commission required the Terminal Association to install cabooses on trains engaged in both interstate and intrastate traffic. Its requirement was upheld by the Supreme Court of Illinois and appeal was taken to the Supreme Court of the United States. In the appeal it was urged that the Illinois Commerce Commission had no jurisdiction to make an order affecting interstate commerce. This claim was denied, the court holding that the record failed to show that the Interstate Commerce Commission had entered the controverted field and made any regulations as to such cabooses. In doing so, it was stated:

"\* \* \* it is unnecessary to consider on this occasion and without the participation of the Interstate Commerce Commission what may be the extent of its power under these Acts [Safety Appliance Acts]. If it should in the exercise of granted power determine whether appellant [Terminal Railroad Association] must provide cabooses, the State would be powerless to gainsay it."

The order made by the Illinois Commerce Commission was sustained by the Illinois Supreme Court as "obviously promulgated to protect the lives and health of citizens of this State engaged in appellee's business within the State," and as not imposing an unlawful burden upon interstate commerce.

The regulation promulgated by the Illinois Commerce Commission was obviously under the police powers of the state to protect the lives and health of its citizens.

Summed up, the case holds that a state may make necessary and reasonable orders in the field of interstate commerce where the same has not been taken over by the Federal Government or its agencies. When the Federal Government or an agency created thereunder invades the field the state cannot add to, modify, or supplement any directives or orders promulgated by the federal authority. It holds that the state may enter such field in the event the higher authority has kept out of such field.

In the Terminal case, the supreme court, in discussing the issues, stated:

"We must decide the question of state power in this case in the absence of any Act of Congress that conflicts with the order [the order of the Illinois Railroad Commission] or may be said to occupy its field."

Inasmuch as there was no Act of Congress which conflicted with the action of the Illinois commission its orders were allowed to stand. I fail to see wherein this case supports the contention of appellant commission.

I have heretofore quoted from the language of the Supreme Court of the United States upon the subject of the

jurisdiction of the Federal Government in matters of interstate commerce, and from the case of Prigg v. Commonwealth of Pennsylvania, 16 Pet. (U. S.) 539, 10 L. Ed. 1060, and I need not repeat such quotation. In that case the decision was by the eminent jurist, Story, and therein he set forth some of the limitations and restrictions upon the power of Congress to legislate in such cases. So far as I have been able to determine, the decision in that case has never been overruled or modified by our highest court. It seems to me that it has application in the present case.

The Act of Congress gave to the Interstate Commerce Commission power and authority to make certain regulations, limited by the outline of the purposes of the act. The majority opinion seems to be based upon the premise that the Interstate Commerce Commission did not enter the field unless they made detailed and specific rules; that the failure to make such detailed and specific rules in regard to cabooses with but one platform left that field open to state regulations. It is difficult to harmonize this claim with the holding of the Supreme Court of the United States in the cases heretofore cited: Southern Railway v. United States, supra; Southern Railway v. Railroad Commission of Indiana, supra. Note the language of this cited case: "Under the Constitution the nature of that power is such that when exercised it is *exclusive*, and ipso facto, supersedes existing state legislation on the same subject." 236 U. S. 439, 446, 35 S. Ct. 304, 305, 59 L. Ed. 661. See, also, State ex inf. Haley v. Missouri Pac. Ry. Co., supra; Pennsylvania R. R. Co. v. Public Service Commission of Pennsylvania, supra. (I commend a careful study of this case by the justices who have joined in the majority opinion.) The setting out in the majority opinion of long involved discussion adds nothing to a solution of the real question.

The appellant commission concedes that in the event the National Safety Appliance Acts *have invaded the field,* then the state has no right to legislate concerning the matters in issue.

The Act of Congress creating the Interstate Commerce Commission related to railroads, tracks, engines, and rolling

.stock. Certainly a caboose is a part of the rolling stock of a railroad. The commission issued elaborate and detailed regulations "for *all* classes of cars and locomotives." As before set forth, these regulations relate to cabooses with two platforms and those with one. It seems difficult to harmonize such with the long and involved discussion of the majority opinion that the narrow field between no platform and two platforms had been left open to state regulation. I do not find that the cases above cited and quoted from have ever been criticised or overruled and the majority opinion, in a wilderness of citations, seems for the most part to have overlooked them. I think that the cited case of State ex inf. Haley v. Missouri Pac. Ry. Co., 323 Mo. 653, 19 S. W. 2d 879, is a decision which cannot be overlooked. It is absolutely on "all fours" with the present case.

I will next consider the appeal of plaintiff, heretofore referred to as the cross-appellant. This cross-appeal is based upon the following finding and conclusion of the trial court:

"Insofar as the order of the Commerce Commission of the State of Iowa is confined to trains engaged exclusively in intrastate commerce it is the finding and conclusion of this court that under the law, that is a legal and valid exercise of power by the state of Iowa being exercised under the rules and orders of the Commerce Commission of the State of Iowa, and is a valid and enforceable order."

Later the trial court filed a decree in harmony with such finding and conclusion.

This ruling of the trial court, under the record herein, cannot be sustained. I think that the question involved was squarely passed upon by the Supreme Court of the United States in passing upon the National Safety Appliance Acts. That court has held that such acts are applicable to all operations of an interstate carrier by railroad regardless of whether these operations were interstate or intrastate.

In support of the foregoing, I desire to quote the language of the headnotes in the case of Southern R. Co. v. United States, supra, 222 U. S. 20, 32 S. Ct. 2, 56 L. Ed. 72, as follows:

"Congress had the power, under the commerce clause of the Federal Constitution, to require, as it did in the safety-appliance act * * * that all locomotives, cars, and similar vehicles used on any railway engaged in interstate commerce, shall be equipped with designated safety appliances, regardless of whether such vehicles are used in moving intrastate or interstate traffic." [32 S. Ct. 2, headnote 2.]

Further in that same case we find the following:

"Cars used in moving intrastate traffic on a railway which is a highway of interstate commerce are comprehended by the provisions of the safety-appliance act * * * declaring, inter alia, that its provisions and requirements shall 'apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce.'" [32 S. Ct. 2, headnote 1.]

See, also, Swinson v. Chicago, St. P., M. & O. Ry. Co., supra; Southern Ry. Co. v. Railroad Commission of Indiana, supra.

I would affirm on appellant's appeal and reverse on the cross-appeal.

MILLER, HALE, and SMITH, JJ., join in this dissent.